## ADOPTION OF GWENDOLYN.

No. 89-P-1425.

Middlesex. May 18, 1990. - August 16, 1990.

Present: ARMSTRONG, BROWN, & GILLERMAN, JJ.

*Minor*, Care and protection, Custody, Adoption. *Parent and Child*, Care
and protection of minor, Custody of minor. *Adoption*, Dispensing with
parent's consent, Visitation rights.

In a care and protection proceeding the judge's findings that the mother
was not currently fit to care for the needs of her minor daughter and
that it was in the daughter's best interests to award permanent custody
to the Department of Social Services were supported by clear and con-
vincing evidence. [132-134]

In a proceeding under G. L. c. 210, § 3, to dispense with the need for
parental consent to the adoption of a minor child, the judge's finding
that the mother's unfitness due to chronic mental illness was such that
it would be in the best interests of the child to terminate all legal rela-
tions with the mother and to allow the adoption to go forward was sup-
ported by clear and convincing evidence. [134-136]

In a proceeding to dispense with the need for parental consent to the adop-
tion of a minor child, language in the judgment that appeared to be a
final order forbidding any visitation between the biological mother and
her daughter was not supported by the evidence. [137-139]

PETITION filed in the Concord Division of the District
Court Department on September 19, 1986.

PETITION filed in the Middlesex Division of the Probate
and Family Court Department on August 3, 1987.

The cases were consolidated for trial in the Probate and
Family Court Department and were heard by *Arthur G. Cof-
fey*, J.

*Michael D. Cutler* for the mother.

*Rosanna Cavallaro*, Assistant Attorney General, for De-
partment of Social Services.

GILLERMAN, J. Gwendolyn was Sally's third child.[1] (All names are fictitious.) At Gwendolyn's birth on July 28, 1986, Sally's first two children had, for a considerable period, been under the care and custody of the Department of Social Services (the department) — since 1981 in the case of her first child, and since 1984 in the case of her second child. Gwendolyn's father was in Bridgewater State Hospital for chronic mental illness and Sally had been hospitalized for chronic mental illness on fourteen prior occasions, the first of which was in 1975 and the last of which, prior to Gwendolyn's birth, was in December, 1984. The judge found that the diagnosis of Sally's condition "included paranoid schizophrenia and manic depression."

On September 18, 1986, seven weeks after Gwendolyn was born, Sally was again committed to the Metropolitan State Hospital and Gwendolyn was placed in emergency foster care. On September 19, 1986, the department filed a petition for care and protection in the Concord District Court (the custody case) and received Gwendolyn into its physical custody on that day. The District Court granted temporary custody of Gwendolyn to the department on October 24, 1986.[2] On August 3, 1987, the department filed a petition in the Middlesex Probate Court to dispense with the consent of Gwendolyn's parents to the adoption of Gwendolyn (the § 3 case). See G. L. c. 210, § 3(b).

The two cases were consolidated for trial, as expressly authorized by G. L. c. 210, § 3, beginning March 7, 1989. After a three-day trial, the judge found that Sally and the father were currently unfit to care for Gwendolyn, and judgment in the custody case was entered awarding permanent custody of Gwendolyn to the department. Judgment in the § 3 case, after reciting the unfitness of the parents, provided that (i) "it is in the best interest of the child to termi-

---

[1] After the trial and prior to argument, Sally remarried and gave birth to her fourth child.

[2] No question is raised with respect to the "seventy-two hour hearing" requirement contained in G. L. c. 119, § 24. See *Care and Protection of Robert*, 408 Mass. 52, 55 & n.3 (1990).

nate the parental rights of [Sally and the father]," and (ii) "[t]here shall be no further visitations between the biological parents and the minor child." Sally has appealed from the judgment entered in each of the two cases. The father, for whom a guardian ad litem had been appointed, did not appear at the trial and did not claim an appeal from the judgments. (At the trial the judge noted he was on escape status from Metropolitan State Hospital.)

Our review of the judge's decision proceeds on established principles. The required detailed findings by the judge, which will not be disturbed unless clearly erroneous, *Care and Protection of Stephen*, 401 Mass. 144, 151 (1987); *Care and Protection of Martha*, 407 Mass. 319, 327 (1990), must nevertheless be supported by clear and convincing evidence, *Santosky* v. *Kramer*, 455 U.S. 745, 747-748 (1982), of parental unfitness, *Custody of a Minor (No. 1)*, 377 Mass. 876, 882 (1979); *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. at 119; *Adoption of Frederick*, 405 Mass. 1, 4 (1989); *Care and Protection of Martha*, 407 Mass. at 327, viewed in the context of the child's welfare, *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 641 (1975); *Adoption of Frederick*, 405 Mass. at 4. These principles apply to custody cases as well as petitions to dispense with parental consent to adoption. *Custody of a Minor*, 389 Mass. 755, 765 (1983). *Custody of a Minor (No. 2)*, 392 Mass. 719, 725 (1984).

1. *The Custody Case.*

The judge noted that he heard the cases seriatim, with the custody case being considered and adjudged first. Thus we start with the custody case, bearing in mind that the award of permanent custody to the department does not necessarily determine the outcome of the § 3 petition. Compare G. L. c. 119, § 26, with G. L. c. 210, § 3.

The judge's twenty-four page opinion provides adequate documentation of his findings, supported by clear and convincing evidence, summarized below, that Sally is not currently fit to care for the needs of her daughter, and that it is

in Gwendolyn's best interests to award permanent custody to the department.

Sally's illness is both persistent and episodic; that is to say, Sally has periods of lucidity, but they are interrupted, inevitably, with periods of seriously aberrational behavior. The judge found that Sally's thoughts are impaired with paranoid ideas and an inability to think coherently. Her illness leaves her unable to differentiate her own needs from those of Gwendolyn; frightened for herself of the consequences of sleep, she believes that sleep is threatening to Gwendolyn. She is convinced periodically that her children are being sexually abused by the very people attending to the children's interests, and she is equally convinced from time to time that her husband is the object of sexual advances by those who are concerned with her well-being, including the case workers.

In periods of mental disarray Sally's language can become extremely foul and her perception of reality exceedingly dim. Moments of stress can precipitate hallucinations and destructive fantasies, and during these periods of deep trouble, caring for Gwendolyn is utterly beyond Sally. When in better condition, caring for Gwendolyn can be sustained by Sally, but not for long periods of time. While her disease may be amenable to some extent to therapy and medication, in recent years she has rejected both. Thus the prognosis is poor and her condition may be worsening. Sally is "profoundly disturbed," the judge found, a conclusion confirmed and supported by psychological evaluations adopted by the judge as part of his findings. See *Care and Protection of Stephen*, 401 Mass. at 151.

The outcome is a disabling disease which prevents Sally from being a reliable parent able to care for the almost constant needs of a very young child. Sally was, therefore, incapable of being, and thus "unfit" to be, the parent of Gwendolyn, responsible for her care and nurturing. See *id.* at 151-152 (past and current mental illness amply supported determination of unfitness). In sum, there was clear and con-

vincing evidence supporting the judge's conclusion that permanent custody should be given to the department.

2. *The § 3 Case.*

The allowance of the petition in the § 3 case means "that the parent no longer has the power to prevent the termination of . . . [all] rights, duties, and other legal consequences of . . . [her] relation to . . . [her] child." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 119 (1984). "For this extreme step to be taken, we believe that it must be shown by clear and convincing evidence that the parent's unfitness to assume parental responsibility is such that it would be in the best interests of the child for all legal relations to be ended." *Ibid.*

The custody case adjudicated Sally's current unfitness to care for Gwendolyn. What is required in the § 3 case is an assessment of Sally's capabilities when what is at stake is the irreversible termination of Sally's parental and legal relationship to Gwendolyn.[3]

As in *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption*, 395 Mass. 180, 184-185 (1985), the mother here is overwhelmed with her own problems, and her refusal to accept medication or therapy contributes substantially to the unfavorable prognosis. Being a parent is not a sometimes thing; the occasional but potentially decisive intervention by Sally under G. L. c. 119 could be enormously disruptive, and especially so if Sally's emotional and mental

---

[3]Statutory custody under G. L. c. 119, § 21, includes the power to: (i) determine the child's place of abode, medical care and education; (ii) control visits to the child; and (iii) consent to enlistments, marriages and contracts requiring parental consent. After an adjudication awarding custody to the department, the parent is left with the residual rights, see *Custody of a Minor (No. 1)*, 377 Mass. at 884-885, to seek to modify or terminate the custody, see G. L. c. 119, including § 21 (definition of "custody" includes parental right to seek judicial review of the exercise of the enumerated powers), § 26 (review of needs of the child not more than once every six months) and § 35, and any additional rights, not inconsistent with c. 119, that may be embraced by the settled doctrine that biological parents are the "natural guardians" of their child. *Richards* v. *Forrest*, 278 Mass. 547, 553 (1932). All of these residual rights are terminated upon the allowance of a § 3 petition.

condition falls far short of what is then needed for a parental decision that must focus on Gwendolyn's needs and potential development. The wise exercise of parental responsibility — difficult under the best of circumstances, but most particularly so when the child's father has abandoned all responsibility — has no prospects for success when it is hobbled by a disabling and probably deteriorating mental disease. Sally's long history of mental illness and parental unfitness has prognostic value which plainly fills any alleged gap in the evidence of Sally's condition.[4] See *Custody of a Minor (No. 1)*, 377 Mass. 876, 883 (1979); *Care and Protection of Stephen*, 401 Mass. at 152; *Custody of Michel*, 28 Mass. App. Ct. 260, 269-270 (1990). To be sure, there is no fault or blame, no abuse, no neglect; Sally has been overtaken by a disease she did not cause and would not have chosen. But moral innocence is not necessarily a decisive factor in a § 3 case.

In addition to Sally's unfitness, we are obliged to consider, as Justice Kaplan wrote in *Petition of New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 641 (1975), the "cognate" test, Is Sally's illness such that it is in the best interests of Gwendolyn to terminate their legal relations? The judge concluded that it is in Gwendolyn's best interests, and we agree.

Consideration of Gwendolyn's welfare must start with the fact that she has been in foster care from the time she was two months old, and she has been with her current foster parents almost all of that time. There was expert opinion testimony, which the judge adopted, that Gwendolyn's relationship with the foster parents is "well established in terms of her attachment and bonding with her foster mother [who is]

---

[4]Sally claims that her then boyfriend, and now husband, created an entirely new environment which must be evaluated by the judge in further hearings. However, the information in the record about her second husband was deeply troubling (in 1984 he pleaded guilty to incest and rape of his sixteen year old daughter), and further hearings would be futile. Sally also claimed that the information concerning her was *not* sufficiently current. The judge responded by ordering a mid-trial observation of the mother-child relationship by the child's guardian ad litem, and the judge was satisfied with the subsequent oral report concluding that parental unfitness continued. We see no reason to disagree.

. . . a source of psychological safety." Gwendolyn calls her foster parents "Mommy" and "Daddy," and although Gwendolyn is relaxed with Sally, she sees Sally as a familiar adult rather than as her psychological mother. In spite of her ominous start in life, Gwendolyn's prospects for a healthy and consistent family environment with her foster parents now appear to be favorable. Gwendolyn's legal adoption by her psychological parents would only enhance those prospects while the rejection of the foster parents as adoptive parents could only dim the outlook.

If adoption is not to be approved, Gwendolyn, in all likelihood, will spend her childhood in temporary arrangements that inevitably lack the security and stability that an advantageous adoption can provide. In this context, Sally's inability to be a fit parent because of her chronic mental illness is a decisive factor. It is in the best interests of Gwendolyn to have "parents" who can and who will, on a consistent, long-term basis, assume all parental responsibilities and who can provide Gwendolyn with the stable and continuous care and nurturing she needs and will continue to need as a child. See *Custody of a Minor (No. 1)*, 377 Mass. at 882. The continued reservation of Sally's rights to intervene in the decisions that affect Gwendolyn's life, in the circumstances presented here, can only be contrary to Gwendolyn's best interests.

While our courts have emphasized that prospective adoptive parents are not to prevail "automatically," even when the child sees them as her psychological parents, *Custody of a Minor (No. 2)*, 392 Mass. 719, 724 (1984), and cases cited at 724-725, those cases do not state a rule of disqualification for the prospective parents. The controlling issue is whether a now four year old girl with a single parent seriously disabled with a chronic mental illness would be benefited more by adoption than she would by the continued intervention in her life of her chronically ill and unfit mother. The judge's finding that the adoption should go forward is supported by clear and convincing evidence.

### 3. *Postadoption Visitation.*

In both brief and argument Sally presses with considerable force the right to continue to visit her daughter following an adoption without her consent, should that occur.[5]

The § 3 judgment provided that "there shall be no further visitations between the biological parents and the minor child." It is possible to interpret this as a final order forbidding visitation at any time and under any circumstances. For several reasons, we conclude that the judge's intention was not to forbid visitation but was merely to deny Sally's request for settled and enforceable visitation rights. In other words, we take the judge's meaning to be that visitation was to be in the complete discretion of Gwendolyn's adoptive parents.

The principal witness with regard to visitation was the guardian ad litem (GAL) whom the judge appointed for Gwendolyn. The GAL filed a written report dated May 27, 1988, and, at the judge's request, visited Sally and Gwendolyn while the trial was in progress in order to make certain that his opinions and recommendations were not based on stale information. Note 4, *supra.* See *Adoption of George*, 27 Mass. App. Ct. 265, 268 (1989). He testified that his written report and recommendations were unchanged by the March, 1989, visit.

The May, 1988, report, ten pages long, concludes with a discussion of the department's plan for Gwendolyn followed by his summary and recommendations. Based on his inter-

---

[5]Until recently the Supreme Judicial Court had left unanswered the question whether open adoption was permissible without legislative action. *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 376, 379-380 (1981). See *id.* at 379, n.3, for a definition of "open adoption," and n.5 for possible criticism of the concept. Three years later, in *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 702 (1984), the court saw no obstacle to a judge, when evaluating the department's plan, considering whether the child's best interests call for visitation rights after adoption. Just a few months earlier, this court had observed that a judge acting on a § 3 case "must give equal consideration to any plan proposed by the parents." *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 120, 124 n.11 (1984). But see *Adoption of Abigail*, 23 Mass. App. Ct. 191, 200 (1986). Compare *Normand* v. *Barkei*, 385 Mass. 851, 852 n.1 (1982). See *Michaud* v. *Wawruck*, 209 Conn. 407 (1988).

view of Sally, Gwendolyn, and the adopting parents, he reported that Gwendolyn knew that Sally was her biological mother, and he described the support of the adopting parents for the "idea of continued contact after . . . adoption." In his summary the GAL wrote, "Both [biological] parents love their child, and neither has intentionally caused her harm. Especially for Sally, continued contact with Gwendolyn is extremely important. Such contact, as long as it is carefully monitored and supervised should not be detrimental to Gwendolyn, and in fact, may be helpful. Gwendolyn knows that . . . [Sally] is her mother, and as she [grows] older, should have the benefit of knowing that this woman continues to care for her. It is appropriate that Gwendolyn's caregivers have control over any visitation as does occur."[6]

The report and testimony of a psychologist, while confined largely to the issue of unfitness, observed that Sally — though her prognosis is poor — "exhibits a genuine fondness for her children." The psychologist's final report, based on a visit on March 2, 1989, with Sally and Gwendolyn, was to the effect that "Sally's conduct was generally appropriate," and that during the visit, "Gwendolyn appeared comfortable in the situation." The judge found that the psychologist "indicated that Sally . . . could be a caring parent but not a consistent one."

The judge also summarized the testimony of the case worker most familiar with Sally and her children. Her testimony, he found, portrayed Sally "as a caring individual," but not one capable of providing consistent care for Gwendolyn. The plan presented by the department was silent on the visitation issue. There was, in sum, no testimony advocating that visitation be forbidden, regardless of the wishes of the adopting parents.

In these circumstances it seems clear to us that the judge intended merely to deny Sally's application for settled and

---

[6]The GAL also wrote that "the adoption decree [should] provide for an open adoption, with visitation to occur at a maximum of once a month, under supervised conditions, *subject to the adoptive parents' determination that visits continue to be in the child's best interests*" (emphasis supplied).

enforceable visitation rights, properly leaving the matter of visitation in the hands and discretion of the adoptive parents. Without doubt they are the persons who will be in the best position, as Gwendolyn grows from childhood to a young woman, to determine how often, and under what circumstances, Sally's visits with Gwendolyn would be in Gwendolyn's best interests. That arrangement, which in substance follows the recommendation of Gwendolyn's GAL, is entirely appropriate here. The judgment need not contain explicit language to effectuate that arrangement; it is implicit, unless expressly negated, in the eventual adoption which carries with it the incidents of custody. See note 3, *supra*.

For these reasons we delete from the § 3 judgment, as ambiguous and possibly misleading, the clause, "There shall be no further visitations between the biological parents and the minor child." As so modified, the § 3 judgment is affirmed, as is the judgment in the custody case.

*So ordered.*