ADOPTION OF CARLOS.[1]

90-P-1459.

Essex. April 4, 1991. - August 15, 1991.

Present: ARMSTRONG, KASS, & IRELAND, JJ.

Further appellate review granted, 411 Mass. 1103 (1991).

*Adoption*, Dispensing with parent's consent. *Parent and Child*, Dispensing
    with parent's consent to adoption, Care and protection of minor. *Minor*,
    Care and protection. *Evidence*, Child custody proceeding.

In a proceeding under G. L. c. 210, § 3, to dispense with parental consent
    to the adoption of a minor child, the judge's finding that the mother is
    currently an unfit parent taken together with the mother's persistent
    inability to address herself constructively to resolving the cause of her
    unfitness did not support the judge's denial of the petition to dispense
    with parental consent. [239-243]

PETITION filed in the Salem Division of the District Court
Department on May 7, 1986.

PETITION filed in the Essex Division of the Probate and
Family Court Department on May 19, 1988.

The cases were consolidated for trial and were heard by
*Lawrence D. Shubow*, J., sitting under statutory authority.

*Alexander G. Gray, Jr.*, for Department of Social Services.

*Elizabeth B. Dunn* for the mother.

*Kevin D. Cooper* for the minor.

IRELAND, J. This case is a consolidation of a care and pro-
tection petition brought pursuant to G. L. c. 119, §§ 24 et
seq., and a petition to dispense with parental consent to
adoption brought pursuant to G. L. c. 210, § 3. It was heard

---

[1]An appeal was also taken in a consolidated case, Custody of Carlos, but
was withdrawn after briefing but before argument.

by a District Court judge sitting simultaneously as a judge of the District Court and of the Probate and Family Court Departments, in accordance with G. L. c. 210, § 3, and c. 211B, § 9. It is a classic illustration of a type of child custody dispute that is seen with increasing frequency — where a well-intentioned parent is, in effect, put to a choice between a spouse and a child.

The subject of the proceedings, brought by the Department of Social Services (department), is an eight year old boy who, at the age of three, was sexually abused by his stepfather.[2] The child has now been in foster care for more than five years. He loves his mother and wants to be at home with her and his half-brother; he does not understand why he is in foster care and separated from them. The mother sincerely loves her child and her husband and wants to be with both of them. The department does not believe the child would be safe in the presence of the stepfather unless both parents undergo treatment and therapy, an alternative which both parents have historically resisted. The sad reality — and a common dilemma — which this case illustrates is that, in many child custody cases, one parent may have a critical impact on the case, even though the other parent cooperates to some degree in treatment. Without the participation of both parents in treatment, the prognosis for a child's return is often grim, if not impossible. Such a child would be at risk whenever the cooperating parent was not present and awake, and it would be unrealistic to think that one parent could always be available. The bottom line is that the parents are a team; where appropriate, they must address treatment together, and their failure to do so may result in the permanent loss of custody.

We form our background from the required detailed findings of the trial judge, see *Custody of Two Minors*, 396 Mass. 610, 611-612 (1986), which we do not disturb unless they are clearly erroneous. *Care and Protection of Stephen*,

---

[2] The child's natural father died, and the mother in April, 1984, married the child's stepfather. They have had another child, a son born September 12, 1985.

401 Mass. 144, 151 (1987). *Care and Protection of Martha,*
407 Mass. 319, 327 (1990). *Adoption of Gwendolyn,* 29
Mass. App. Ct. 130, 132 (1990).

In April, 1986, the child, then three, was taken to the
home of his maternal grandparents in New Hampshire while
his mother went into a hospital for a liver biopsy. Two weeks
later, the grandparents returned the child to their daughter's
apartment in Danvers and reported that the child told them,
"Daddy put his peter in my bum."[3] The mother testified that
she believed the child made the statement and that he made
similar statements to her a couple of weeks earlier, but she
assumed that he was "making them up." The husband has at
all times denied engaging in any such conduct.

When a Danvers police detective, acting on complaints by
a maternal uncle and an unidentified informant, went to the
parents' residence, the mother described the allegation as an
attempt by her own mother, the child's maternal grand-
mother, to get the child away from her and her husband. The
next day, the detective returned to the residence with an of-
ficer of the Danvers police sexual abuse unit and a depart-
ment investigator and, with the mother's consent, met alone
with the child. During the course of that meeting, the child
said, "Daddy stuck his peter in my bum . . . it dripped."
When asked what it was that dripped, the child stated,
"There I show you," ran into the bathroom, and obtained a
jar of Vaseline. The child went on to say "Daddy put it [Vas-
eline] on his peter . . . he put it in my bum."[4] On the rec-
ommendation of the department, the child's stepfather and
mother met with an evaluator from the Sexual Information
Trauma Team of the North Shore Children's Hospital once;

---

[3] The report of the court-appointed investigator quotes the grandparents
as reporting the child's statement as, "Daddy has a big pee and he put it in
my bum and it hurt."

[4] After the child's parents determined that the maternal grandparents
were not going to let the matter drop, they arranged for a physical exam of
the child two days later at the North Shore Children's Hospital, the results
of which were negative for indications of physical trauma. Thereafter, the
father volunteered for a lie detector test, the results of which were
inconclusive.

they refused to do so again. The evaluator met with the child five times and concluded that "it would be virtually impossible for a child of [this] age to consistently maintain an untrue story of sexual abuse over so much time as the period of this evaluation, especially with the degree of detail and accompanying affect presented by [the child]".

In May, 1986, the department filed a care and protection petition, and the child was placed in the temporary custody of the department. The court reviewed the case several times over the course of the next two years, and in May, 1988, the department filed a petition to dispense with parental consent to adoption. Evidence was taken over nine days between November, 1988, and January, 1989, and the court heard the testimony of sixteen witnesses, including experts for the department and for the mother, the guardian ad litem, and the court-appointed investigator. Among his thirty-eight findings of fact, the judge determined "by clear and convincing evidence that there was at least one act of consummated or attempted anal intercourse. It goes without saying, as no one would dispute, that such conduct constitutes sexual abuse of the child." He also found that "the mother and the department were at an impasse, with the department insisting that the mother acknowledge the sexual abuse that her son had been subjected to, and the mother pathologically unable to do so." The judge provided the mother with, in essence, a blueprint which, if complied with, would allow a finding of parental fitness.[5] In June, 1989, a final judgment was entered in the care and protection proceeding, and an interlocutory order in the petition to dispense with consent to adoption. The judge determined that the child was in need of care and protection by reason of sexual abuse and awarded permanent

---

[5] The judge instructed the mother that, in order to regain custody of her child, she would have to (1) learn about the effects of sexual abuse upon a child; (2) learn how the child is to be protected and taught his right to say "no" and to make disclosures free of fear and hostile reaction; (3) confront the phenomenon of denial and how it works in general and how it may be working in her; and (4) develop the autonomy and independence to demand of her husband that he undertake a course of action not unlike what was being suggested to her.

custody of him to the department. The judge also determined that the mother was unfit[6] and ordered that, although sufficient facts had been found based on clear and convincing evidence to enter a decree dispensing with the need for consent or notice to the mother for adoption of the child, the entry of such a decree was stayed until December 19, 1989, "to afford the [mother] an opportunity to reconsider and modify her response to the allegations of the [department]." In January and February of 1990, several witnesses testified at further evidentiary hearings. In July, 1990, the judge provided a supplemental memorandum of decision, in which he (1) expressly readopted and incorporated by reference the findings of fact and rulings of law embodied in the June, 1989 decision; (2) found that a change in the mother had occurred, but "[t]he change has not been dramatic enough to fully satisfy a fact-finder that the problem is over"; and (3) denied the department's petition to dispense with consent to adoption.

The department appeals from the denial of the petition to dispense with consent to adoption and, in so doing, presents two issues for our consideration: (1) whether the judge applied the proper standard of parental fitness in denying the department's petition to dispense with parental consent to adoption; and (2) whether the subsidiary findings of the judge support his ultimate conclusions. The mother appeals from the judgment in the care and protection case.

*Parental fitness.* A finding of parental unfitness is required whenever the State seeks to limit parental rights to a minor

---

[6] The judge ruled that the mother "is an unfit parent because she can act only on her own perceptions and judgment of reality even in the presence of 'clear and convincing evidence' to the contrary and of risk to her child, physical and emotional. . . . [She] currently lacks the ability, capacity, fitness and readiness to assume parental responsibility because she is unable to recognize that her child was the victim of sexual abuse and because she has joined the abuser in an alliance of pathological denial which further victimizes the child." With regard to the stepfather, who has no rights at issue before us, we observe that the judge determined that he "is unfit to serve as a father because he sexually assaulted the child, will not take any steps, even short of admissions, to deal with his behavior, [and] invented false accounts to explain [the child's] disclosures."

child, whether the State proceeds under the care and protection statute (G. L. c. 119, §§ 23-29), the guardianship statute (G. L. c. 201, § 5), or the adoption statute (G. L. c. 210, § 3). See, e.g., *Petition of New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 646 (1975) [hereinafter cited as *Home for Little Wanderers*] (showing that parents "have grievous shortcomings or handicaps that would put child's welfare" at risk is required to dispense with parental consent under G. L. c. 210, § 3); *Custody of a Minor (No. 1)*, 377 Mass. 876, 880, 882 (1979) (under G. L. c. 119, § 24, "Commonwealth may not attempt to force the breakup of a natural family without an affirmative showing of parental unfitness"); *Bezio v. Patenaude*, 381 Mass. 563, 570-571 (1980) (guardianship statute, G. L. c. 201, § 5, requires showing of parental unfitness to deprive parent of custody). The light in which the court considers parental fitness varies among the different contexts within which it may arise[7] and the judge may properly apply the different standards in the context of a single proceeding. *Custody and Adoption of Ned*, 28 Mass. App. Ct. 557, 559 (1990).

The department argues that the judge erred in denying the petition to dispense with parental consent to adoption by (a) applying an improper standard and (b) reaching conclusions not supported by the subsidiary facts. An award of permanent custody to the department in a care and protection case will not, by itself, dictate the outcome of an accompanying petition under G. L. c. 210, § 3. *Adoption of Gwendolyn*, 29 Mass. App. Ct. at 132. See *Adoption of Frederick*, 405

---

[7] E.g., *Richards* v. *Forrest*, 278 Mass. 547, 552, 554 (1932) (guardianship proceeding in which "unfit" was accorded "its ordinary significance," parental unfitness being determined by reference to parents "own character, temperament, capacity, and conduct, and to the welfare of the child in connection with its age, environment and affections"); *Guardianship of a Minor*, 1 Mass. App. Ct. 392, 395-396 (1973) (same); *Adoption of Gwendolyn*, 29 Mass. App. Ct. at 134 (court determines parental fitness in light of potential irreversible termination of parental and legal relationship to child). Compare *Adoption of Frederick*, 405 Mass. 1, 6 (1989) (in adoption matter, parental fitness is determined in light of adversary relationship between parent and State agency).

Mass. at 12 (findings in care and protection proceeding admissible in adoption proceeding if relevant and material); *Adoption of Oliver*, 28 Mass. App. Ct. at 622 (findings in earlier custody or care and protection proceeding may be given evidentiary weight, but not preclusive effect, in adoption proceeding). Compare G. L. c. 119, § 26, with G. L. c. 210, § 3. For a court to take the extreme step of allowing a petition in a § 3 case, "it must be shown by clear and convincing evidence that the parent's unfitness to assume parental responsibility is such that it would be in the best interests of the child for all legal relations to be ended." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 119 (1984). *Adoption of Gwendolyn, supra* at 134. In a § 3 matter, the court must assess the parent's capabilities in light of what is in the child's best interests. See *Home for Little Wanderers*, 367 Mass. at 641 (" 'best interests of the child' . . . and 'unfitness of the parent' . . . reflect different degrees of emphasis on the same factors, . . . the tests are not separate and distinct but cognate and connected"); *Adoption of Gwendolyn, supra* at 135 (considering parental fitness as well as whether it is in child's best interests to terminate legal relations).

While what is at stake in a § 3 case differs in magnitude from what is at stake in a guardianship or care and protection case, the focus of the court's inquiry into parental fitness, in any of these cases, is limited to the present, that is, the time at which the parent is before the court. See *Adoption of Oliver*, 28 Mass. App. Ct. at 622 (in adoption case, issue before judge is current fitness of parent). The assessment of current parental fitness may take into account past conduct, compare *ibid.*, but the inquiry may not involve speculation about future improvement. Here, the judge, notwithstanding his July, 1989, finding that there was sufficient cause to grant the petition to dispense with consent to adoption, continued the case until December, 1989, in order to give the mother one last chance to demonstrate that she could address the needs of her son. The judge went so far as to provide the mother with a four-part blueprint with which

she would have to comply in order to be adjudged parentally fit. See note 5 *supra*. The mother did not comply, and in July 1990, the judge found that she was merely "prepared to say that her child *may have* been abused and to consider action necessary to protect him from future assault and to believe the consequences of past assault on the assumption it occurred . . . however . . . Until the parents participate in meaningful psychotherapy, with or without an advance admission, there is inadequate protection for the child to be found in an automatic return home" (emphasis in original). Read as a whole, the judge's 1989 and 1990 findings lead inevitably to an ultimate finding that the mother is a currently unfit parent. Such a finding, taken together with the mother's persistent inability to address herself constructively to resolving the cause of her unfitness, does not support the judge's denial of the petition to dispense with consent to adoption. Compare *Care and Protection of Martha*, 407 Mass. 319, 328 (1990) (consolidated care and protection and adoption proceedings), quoting from *Custody of Two Minors*, 396 Mass. at 620 ("good intentions [with respect to therapy and motivation to improve self] are not alone sufficient indicia of ability adequately to care for children"). Our conclusion about the mother's unfitness is in accord with other jurisdictions which have recognized that little purpose is served in returning a child to a potentially injurious environment. See, e.g., *Varnadore* v. *State Dept. of Human Resources*, 543 So. 2d 1194 (Ala. Civ. App. 1989) (court should consider child's retention or return to environment where abuse occurred in determining whether viable alternative to termination of parental rights exists); *Alexander* v. *La Porte County Welfare Dept.*, 465 N.E.2d 223 (Ind. Ct. App. 1984) (mother's failure to protect daughter from abuse by mother's boyfriend warranted termination of maternal rights); *In re Sprite*, 155 Mich. App. 531 (1986) (finding

that mother was unfit supported by her failure to offer support to daughters and permitting father to visit them despite court order forbidding same because he previously sexually abused them, as well as mother's subsequent relationship with abusive and assaultive boyfriend who lost his own child due to neglect); *In re R.*, 62 Or. App. 288 (1983) ("[f]ather's physical abuse, and mother's unwillingness or inability to disassociate herself from him, constitute 'conduct or condition seriously detrimental to the child' " and support finding the mother unfit); *In re D.A.B.*, 313 N.W.2d 787 (S.D. 1981) (mother's parental rights properly terminated where she continued to associate with child's abusive stepfather); *In re S.D.S. and R.L.F.*, 648 S.W.2d 351 (Tex. Ct. App. 1983) (termination of mother's parental rights proper where natural father endangered children and mother failed to report his conduct for five months, by which time "they had already suffered too much").

We further read the judge's denial of the petition to dispense with consent to adoption as embodying the premise that the mother might improve at some future and unspecified time and, eventually, become a fit parent. To the extent that it relied on such a premise, the decision to deny the department's petition employed an impermissible standard, one of future parental fitness. The rationale against allowing a determination of parental fitness to be based on speculative predictions of future capabilities is solidly grounded in the "best interests of the child" policy.

Here, we have a case where the child appears to be at risk of sexual abuse by his stepfather,[8] and the mother will need substantial therapy (as will the stepfather) before she might

---

[8] Although the judge found that "evidence of chronicity" was weak with regard to the sexual abuse inflicted on the child by the stepfather, in his findings about the stepfather the judge related the details of an incident "[d]uring a session at the Children's Hospital on July 14, 1987, [when the stepfather] seemed sullen. At one point he promised to give [the child] a ball if [the child] would give him a hug. The mother encouraged [the child] and finally the child allowed his stepfather to kiss him on the lips. The kiss had an intense and inappropriate sexual nature." The judge also noted that, when they lived together, the family all shared one bedroom even when another was available.

be able, indeed, even willing, to protect the child. The child is currently in foster care, as he has been for half of his life. During much of the time the child was attending unsupervised visits with his mother, he showed signs of internal conflicts, such as mood swings, anxiety, incontinence of feces and urine, speech difficulties, especially under stress and anxiety, and agitation during discussions of the sexual abuse. In addition, he engaged in angry and destructive behavior, as well as bouts of sadness, sleeplessness, and prolonged nighttime crying. In the child's current foster placement, he is said to be doing well. In the circumstances, where the mother has had ample opportunity to comply with a specific program to achieve fitness as a parent but has failed to follow through, it is only fair to the child to say, at some point, "Enough.". After waiting five years in the hope that his mother would respond to treatment, it is not now in his best interests to ask the child to wait an unknown additional period, perhaps until he reaches majority, in the hope that the mother might eventually engage in a meaningful way in treatment.[9] "If adoption is not to be approved, [the child], in all likelihood, will spend [his] childhood in temporary arrangements that inevitably lack the security and stability that an advantageous adoption can provide." *Adoption of Gwendolyn*, 29 Mass. App. Ct. at 136. Such a result cannot be in the child's best interests. Compare *Custody of a Minor (No. 1)*, 391 Mass. 572, 577 (1984) (legislative objective is to avoid unnecessary delays in determination of custody and adoption disputes); *Adoption of Emily*, 25 Mass. App. Ct. 579, 581 (1988) (same).

---

[9] The judge made no findings about the stepfather's treatment efforts from June, 1989, to July, 1990. His active involvement in treatment would, of course, be necessary before the child could be returned to the mother.

For these reasons it was error to deny the department's petition. The decree denying the petition to dispense with consent to adoption is reversed. A decree shall be entered allowing the petition.

*So ordered.*