ADOPTION OF CARLOS.

Essex. March 2, 1992. - August 11, 1992.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Adoption*, Dispensing with parent's consent. *Parent and Child*, Dispensing with parent's consent to adoption, Care and protection of minor. *Evidence*, Child custody proceeding. *Minor*, Care and protection.

In a proceeding under G. L. c. 210, § 3, to dispense with the need for parental consent to the adoption of a minor child, it was appropriate for the judge to consider whether, on the basis of credible evidence, there was a reasonable likelihood that the mother's unfitness at the time of trial might be only temporary; on the evidence presented, the judge was warranted in concluding that the Department of Social Services had not shown by clear and convincing evidence that the child's best interests would be served by termination of his mother's parental rights. [350-351]

PETITION filed in the Salem Division of the District Court Department on May 7, 1986.

PETITION filed in the Essex Division of the Probate and Family Court Department on May 19, 1988.

The cases were consolidated for trial and were heard by *Lawrence D. Shubow*, J., sitting under statutory authority.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Alexander G. Gray, Jr.*, Special Assistant Attorney General, for Department of Social Services.

*Elizabeth B. Dunn* for the mother.

*Kevin D. Cooper* for the minor.

O'CONNOR J. This is the appeal of the Department of Social Services (department) from the denial of its petition to dispense with consent to adoption pursuant to G. L. c. 210, § 3 (1990 ed.). After the petition was denied in the trial court, the Appeals Court reversed and ordered the entry of a

decree allowing the petition. 31 Mass. App. Ct. 233 (1991). We granted further appellate review. We now affirm the judgment entered in the trial court, denying the petition.

In May, 1986, the department filed a care and protection petition in the District Court pursuant to G. L. c. 119, § 24 (1990 ed.). A judge awarded temporary custody of Carlos (a fictitious name) to the department on May 7, 1986. In May, 1988, the department filed the petition to dispense with consent to adoption that is the subject of this appeal. The petition for care and protection and the petition to dispense with consent to adoption were then consolidated for hearing. The hearing took place on nine days between November, 1988, and January, 1989, before a judge sitting in the Probate and Family Court. On June 19, 1989, the judge awarded custody of Carlos to the department "until further order of the court, if any." Although such an order is generally characterized as a "permanent" custody order, G. L. c. 119, § 26 (1990 ed.), provides that specified interested parties "may petition the court not more than once every six months for a review and redetermination of the current needs of such child whose case has come before the court." On June 19, 1989, the judge also ordered the following entry: "Sufficient facts have been found based on clear and convincing evidence to warrant entry of a decree . . . pursuant to G. L. c. 210, § 3, as amended, dispensing with the need for consent or notice to the defendant [mother] in connection with any petition for adoption of [Carlos] subsequently to be sponsored by the [department]. However, entry of any such decree is stayed until December 19, 1989, or until the further order of the court, to afford the said defendant [mother] an opportunity to reconsider and modify her response to the allegations of the petitioner."

On July 21, 1989, the judge issued a lengthy and detailed memorandum of decision containing findings of fact and rulings of law in connection with the aforementioned June 19, 1989, order. We summarize the salient facts and rulings. Carlos was born out of wedlock in September, 1982. His father died without ever having shown interest in Carlos. In

April, 1984, Carlos's mother married another man (stepfather). Carlos knew and accepted that man as his father. Carlos lived with his mother and stepfather and with a half-brother who was born when Carlos was three years old. In the spring of 1986, Carlos stayed with his maternal grandparents while his mother was hospitalized. The grandparents informed Carlos's mother that Carlos had told them that his stepfather had sexually abused him. A maternal uncle and another person filed complaints of child abuse pursuant to G. L. c. 119, § 51A. Based on an evaluator's report contained in a hospital record and on expert testimony and other evidence, the judge found by clear and convincing evidence that there was at least one act of sexual abuse by the stepfather.

We continue our recitation of the judge's material findings. As a result of the temporary custody award on May 7, 1986, Carlos was placed in a foster home, where he "exhibited episodes of anxiety, swings of mood, incontinence of feces and urine, speech difficulties especially under stress and anxiety, and agitation during discussions of the sexual abuse." Carlos manifested anger, sometimes directed at his mother, sometimes directed at his stepfather and sometimes directed at himself. On March 30, 1987, the first foster parents "gave up" and Carlos was moved to a second foster home.

After describing Carlos's behavior, the judge said in his memorandum, "When all is said and done . . . there is no way for this court to sort out how much of [Carlos's] negative behavior and internal conflict is due to the original assault and how much to the fact that the child has had to bear the burden of separation from his natural ties. [Carlos] has indicated he does not know why he is separated from his mother and brother, has expressed inconsistent attitudes to[ward] his father, and acceptance of his current circumstances. When he was given an opportunity, however, to make a choice he indicated to the court quite touchingly that he wanted to live with his mother. . . . [Carlos] needs . . . to know that he is not disbelieved. He needs all possible protec-

tion from further abuse. He needs to know that his present circumstances are not his fault. He needs help in processing and accepting his history without suffering unnecessary damage because of it. He needs to be free of any retribution for his disclosures. . . . Under the present circumstances, return to the custody of the mother carries a strong and unacceptable risk of permanent injury to [Carlos]. The court adopts the opinion of [two named individuals] that [Carlos's] return to his parents under the present situation is not in his interest."

The judge made extensive findings with respect to the mother's and stepfather's characteristics. He found that "[t]he mother loves her husband, is dependent on him, essentially passive in his presence, rarely interferes with his behavior, and is totally invested in him as her sole source of support and security. She sees the situation as one in which she has been served an ultimatum, in the words of the [guardian ad litem], either acknowledge that her husband has sexually abused her son and separate from him, or face the probability that she lose custody of [Carlos] forever. That is not, the court finds, a realistic picture of her options, but if it is, she seems to have made her choice: unyielding absolute loyalty to her husband no matter what the cost to [Carlos]."

The judge found that the "interactions of [the mother and stepfather with Carlos] have been the subject of many observations with many negative features noted," but he noted that "there are also many examples of positive, even loving, interrelationships. The court observed how eagerly and warmly [Carlos] crawled into his mother's lap when he came into a court session held in the lobby." The judge observed, "The obvious limitations in the general parenting skills of the parents would be insufficient, in and of themselves, to call for awarding custody to the [department] or terminating the mother's parental rights. This is essentially admitted by the decision of [the department] to leave the younger brother with his parents. But they shed some added light on the fundamental refusal to deal with the issue of sexual abuse. As the mother's expert testified, a mother who cannot face the

possibility that her child was sexually abused cannot prepare herself to protect the child in the future. . . . It is open to the mother (and for that matter the step-father) without admitting that any criminal act occurred to agree to behave as though those who think so may have a point and ask what is to be done under the circumstances. The mother should be ready to adopt a 'what if it's true' strategy. She might then inquire of the child's present caretakers and of her own therapist, 'What am I called upon to do? How do I make sure [Carlos] suffers no recurrence or future bad experiences? How can my marriage be saved?' Their, and more importantly her, refusal to entertain such alternatives prevent[s] restoration of her custody at the present juncture."

The judge continued: "The court is not calling upon the mother to engage in a ritual or recite a formula to appease the child's custodians but rather to undertake an exploration of what loving parents are called upon to do when they discover their child may have been abused. That includes learning about the effects of sexual abuse upon a child, how the child is to be protected and taught his right to say no and to make disclosures free of fear of hostile reaction. Also included is confronting the phenomenon of denial and how it works in general and may well be working in her. She will need to develop the autonomy and independence to demand of her husband that he undertake a course of action not unlike what is being now suggested to her. The court also called upon [the department] to seek alternatives to the Hobson's choice [either the stepfather would confess, and the mother would acknowledge, that the stepfather sexually abused Carlos, or the mother would lose Carlos] that it may have at times communicated. It will be late, but perhaps not too late, on December 19, 1989, to appraise the good faith efforts of the parties. . . . In fairness to the mother, she has tried to cooperate and even to benefit from services [offered by the department] so long as the words 'sexual abuse' were not directly or indirectly implicated. That will have to change. There is no avoiding the issue. . . . What was and is needed is a simple openness to the assumption that the assault has oc-

curred and consideration of the steps necessary to be taken *if*
that assumption were to be a premise for remedial action.
[Carlos] is basically a healthy, if conflicted, child but not so
damaged as to be beyond therapeutic help. [Carlos] is the
victim of his mother's present blindness. Fortunately, the
abuse was short-lived. Evidence of chronicity is weak." (Em-
phasis in original.) The judge also noted that "[t]he depart-
ment has not offered in evidence a finally developed adoption
plan."

The judge concluded that "[t]he mother's uncompromis-
ing, unyielding allegiance to her husband makes her pres-
ently [June 19, 1989] unfit to function as [Carlos's] par-
ent. . . . So long as she is unable to accept even the
hypothesis that [Carlos] may have been assaulted, even if she
doesn't personally believe it, she is an unfit parent." The
judge also concluded that the stepfather was "unfit to serve
as a father because he sexually assaulted the child, will not
take any steps, even short of admissions, to deal with his be-
havior, [and] invented false accounts to explain [Carlos's]
disclosures."

After ruling that "[t]he evidence warrants the conclusion
that the mother . . . currently lacks the ability, capacity, fit-
ness and readiness to assume parental responsibility because
she is unable to recognize that her child was the victim of
sexual abuse and because she has joined the abuser in an
alliance of pathological denial which further victimizes the
child," the judge announced that "[a] judgment terminating
parental rights will not enter until December 19, 1989, to
afford the mother a further opportunity to consider other
courses of action than her present one." It will be
remembered that, on June 19, 1989, approximately one
month before the judge issued his memorandum of decision,
the judge ordered: "Sufficient facts have been found based on
clear and convincing evidence to warrant entry of a decree
. . . pursuant to G. L. c. 210, § 3, as amended, dispensing
with the need for consent or notice to the defendant [mother]
in connection with any petition for adoption of [Carlos] sub-
sequently to be sponsored by the [department]. However, en-

try of any such decree is stayed until December 19, 1989, or until the further order of the court, to afford the said defendant [mother] an opportunity to reconsider and modify her response to the allegations of the petitioner." The department did not appeal from the judge's interlocutory order.

In early 1990 the judge held a further evidentiary hearing, and on July 6, 1990, the judge issued a supplementary memorandum of decision. The memorandum made clear that approximately a year earlier the judge had made a final decision with respect to the care and protection petition, but that the judge's decision at that time with respect to the petition to dispense with consent to adoption was not final. The memorandum states, "While sufficient facts were found to support a judgment dispensing with the need for the mother's consent to an adoption, the court was not definitively satisfied that an alternative outcome looking toward re-unification of the mother and child was not attainable with more movement away from the hardened adversarial stance of the parties. December 19, 1989, was selected as the date to appraise the good faith of the parties in searching out new ways of dealing with the child's undeniable plight: victimized by sexual assault on at least one occasion by his step-father and further victimized by years of separation from his parents (the step-father was the only father he had known) and from his baby brother." (Footnote omitted.) The memorandum further states, "Each of the findings of fact and rulings of law embodied in the decision of July 21, 1989, [has] been re-examined in the light of evidence adduced during the 1990 hearings and further argument received. No sufficient reason appears to change any of them (except the continuance for entry of judgment). The entire decision is re-adopted and incorporated by reference herein.

"As the earlier decision suggested, the time did not then seem ripe, although the underlying facts warranted it, to order judgment terminating the mother's parental rights. Delay was provided 'to afford the mother a further opportunity to consider other courses of action other than her present one.' . . . Her course of action at the time was described as

one in which '. . . she is unable to accept even the hypothesis that [Carlos] may have been assaulted, even if she doesn't personally believe it.' . . . That has changed. The change has not been dramatic enough to fully satisfy a fact-finder that the problem is over. On the other hand the court is satisfied that significant progress has been made and that new dynamics are at work. It follows that a decision in the mother's favor is to enter on the [c. 210, § 3] petition.

"The problem all along has been the irreconcilable standoff between the [department's] position that something akin to confession was called for and the 'pathological denial' of the mother and her husband, the boy's step-father.

"The [department] has adhered rigidly, despite the court's determination embodied in . . . the original decision that confession was the *initial* sine qua non of progress. . . . The mother was expected to sign a service plan for 1990 containing the entry '*Changes Needed*: The case can be closed when [Carlos] is placed in a permanent adoptive home.' The plan further asserts: 'In order for consideration of changing the permanent plan for [Carlos] to return home, [the mother and stepfather] need to acknowledge that [Carlos] was sexually abused by his step-father.' Implicit in this fixed position is the clinical assumption apparently held by [department] social workers . . . that treatment could not commence without acceptance by the parents of the [department's] (and the court's) version of history. In view of the finding of 'pathological denial' on the part of the parents (that is a state of mind not open to simple reason or able to accept painful or upsetting reality), the [d]epartment's position was a formula for failure which the court rejects. The court finds . . . that progress was possible in the absence of a 'confession' or 'acknowledgement' and that therapeutic options, including treatment groups, exist for 'perpetrators' who are not able or willing to admit at the outset or expressly recognize their problem.

"The mother's position has evolved although not very far. She is now prepared to say that her child *may have* been abused and to consider action necessary to protect him from

future assault and to believe the consequences of past assault
on the assumption it occurred." [Emphasis in original.]

"The [d]epartment has not been willing to weigh the con-
siderations that admission by the step-father may be per-
ceived by him to carry in its train the real risk of a substan-
tial prison sentence, that acknowledgment by the mother in
her view would pose an immediate threat to her custody of
her other child and at the same time summarily terminate
her marriage. These considerations arise in the context where
there has been no evidence of chronic abuse and, as the court
has already found, it is by no means clear whether the child
has been more traumatized by the separation than by the
abuse.

"The court agrees, however, with the guardian ad litem
that until the parents participate in meaningful psychother-
apy, with or without an advance admission, there is inade-
quate protection for the child to be found in an automatic
return home. The parents need to be assured of the confiden-
tiality of such treatment and be free to reveal their most per-
sonal secrets. Surely it should be possible to arrange for ther-
apy with the therapist(s) allowed to give their ultimate
opinions about parenting and custody without disclosing priv-
ileged communications. These are considerations that need to
be explored in the future reviews mandated by statute.

"Given the fact that [the department] has found no reason
to seek to disturb the custody of the younger sibling, and that
the mother has been ready to surrender (even if only to a
modest degree) her own previously fixed posture, it is time
for the [department] to do likewise. If the diagnosis of 'path-
ological denial' is sound as the [d]epartment believes (and
the court agrees), that is an issue that needs to be addressed.
It appears that it was not considered during the therapeutic
intervention that has taken place.

"The court finds that progress in bringing the mother to
fuller   insight   has   been   inhibited   in   part   by   the
[d]epartment's unwillingness to consider all reasonable strat-
egies for overcoming her denials. The [d]epartment has un-
derstandably adhered to the clinical advice of the profession-

als on which it relies. The court finds that other options, principally group or individual therapy not based on 'confession' as a precondition, need to be tried.

"The child has been regularly visiting with his mother, and remains attached to her. He is eager to return home. If his present therapist declines to continue to treat him under such circumstances, another will need to be found.

"Upon the basis of the facts found, and in reliance on the arguments of the guardian ad litem, counsel for the child and counsel for the mother, the probate petition under G. L. c. 210, § 3, is denied.

"Judgment on the probate aspect of the case is to be entered dismissing the petition." The department appealed.

A parent's right to the custody of his or her child may not be terminated under the care and protection statute, G. L. c. 119, §§ 21-39 (1990 ed.), or the adoption statute, G. L. c. 210, § 3 (1990 ed.), without clear and convincing evidence that the parent is currently unfit to further the child's best interest. *Care & Protection of Martha*, 407 Mass. 319, 327 (1990). Furthermore, parental fitness and the best interests of the child are interrelated factors. *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 641 (1975). The judgment must analyze the parent's character, temperament, capacity and conduct in relation to the particular child's needs, age, affections and environment. *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 589 (1981). The department argues that, in denying the department's petition, the judge not only failed to properly focus on Carlos's needs and best interests, but also he inappropriately applied a standard of future, rather than present, parental fitness. According to the department, "[i]n denying the Department's petition, the court apparently relied upon the possibility of future therapy to address [the mother's] present incapacities. The court was convinced that the statutory 'future reviews' [under the provisions of c. 119, § 26, the care and protection statute] would provide [the mother] with the opportunity to demonstrate her progress" (footnote omitted).

"[T]he trial court concluded," the department says, "that because [the mother] may become a fit parent in the future, her parental rights should not be irrevocably terminated." Finally, the department contends that the judge's subsidiary findings not only do not support his decision to dismiss the petition, but indeed require its allowance.

The Appeals Court agreed with the department. *Adoption of Carlos*, 31 Mass. App. Ct. 233 (1991). The court noted that "[a]n award of permanent custody to the department in a care and protection case will not, by itself, dictate the outcome of an accompanying petition under G. L. c. 210, § 3." *Id.* at 238. The court also observed that "[f]or a court to take the extreme step of allowing a petition in a § 3 case, 'it must be shown by clear and convincing evidence that the parent's unfitness to assume parental responsibility is such that it would be in the best interests of the child for all legal relations to be ended.'" *Id.* at 239, quoting *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 119 (1984). See also *Adoption of Gwendolyn*, 29 Mass. App. Ct. 130, 134 (1990). We agree with those observations. We do not agree, however, with the Appeals Court's further statements that, in connection with petitions to terminate all parental rights, inquiry concerning future parental fitness is inappropriate. The Appeals Court states, *id.* at 239, "While what is at stake in a § 3 case differs in magnitude from what is at stake in a guardianship or care and protection case, the focus of the court's inquiry into parental fitness, in any of these cases, is limited to the present, that is, the time at which the parent is before the court." Again, the Appeals Court states, "We further read the judge's denial of the petition to dispense with consent to adoption as embodying the premise that the mother might improve at some future and unspecified time and, eventually, become a fit parent. To the extent that it relied on such a premise, the decision to deny the department's petition employed an impermissible standard, one of future parental fitness." *Id.* at 241. Based at least in part on that legal reasoning, the Appeals Court concluded, consistent with the

department's position, that "[r]ead as a whole, the judge's 1989 and 1990 findings lead inevitably to an ultimate finding that the mother is a currently unfit parent. Such a finding, taken together with the mother's persistent inability to address herself constructively to resolving the cause of her unfitness, does not support the judge's denial of the petition to dispense with consent to adoption." *Id.* at 240.

Differently from the Appeals Court, we think that, in weighing the question whether parental rights are to be irrevocably terminated, it is appropriate for a judge to consider whether, on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary. A judge may properly be guided by evidence demonstrating reason to believe that a parent will correct a condition or weakness that currently disables the parent from serving his or her child's best interests. In this regard, there is a significant difference in impact on both the parent and the child between an award of custody in a care and protection proceeding, which primarily addresses only current fitness and is reviewable every six months under c. 119, § 26, and the "extreme step" of terminating the parent and child's legal relationship. See *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 119 (1984); *Adoption of Frederick*, 405 Mass. 1, 5 (1989). In determining whether that extreme step should be taken, consideration of the future is a necessity. The natural bond between parent and child should not be permanently severed unless the child's present or future welfare demands it. None of our cases, in which we have said that current parental unfitness is a prerequisite to the allowance of a petition to dispense with consent to adoption, should be construed as *requiring* such an extreme step whenever the parents are currently unfit, or as limiting the inquiry to parental fitness at the time of trial.

It is clear from the judge's comprehensive findings, rulings and orders that he fully appreciated the substantial difference between awarding custody under c. 119, § 24, subject to periodic review under § 26, and the irreversible termination

of the parent-child legal relationship under c. 210, § 3. It is also clear that the judge focused on the child's welfare. The judge's concern about Carlos's best interests is demonstrated not only by his discussion of the effect on Carlos of his having been sexually abused and of his mother's "pathological denial" of that fact, but also by his discussion of Carlos's "negative behavior and internal conflict" which, the judge noted, may to some degree have been due to "the fact that the child has had to bear the burden of separation from his natural ties." It is apparent that the judge was at no time satisfied by clear and convincing evidence that Carlos's best interests would be served by a termination of his mother's parental rights. Instead, and in the absence of any fully developed adoptive plan put forth by the department, the judge concluded on adequate evidence (the department does not challenge the judge's subsidiary findings) that between June, 1989, and early 1990 the mother had made "significant progress" with respect to her critical area of parental unfitness, namely her denial that her child had been sexually abused. We accept the Appeals Court's declaration that inquiry about parental fitness "may not involve speculation [in the sense of guesswork] about future improvement," *Adoption of Carlos, supra* at 239, but the judge's unchallenged findings about the mother's improvement, made after a three-day hearing, cannot be considered guesswork. We conclude that the judge's denial of the department's petition was not erroneous. The judgment is affirmed.

*So ordered.*