PETITION OF CATHOLIC CHARITABLE BUREAU OF THE
ARCHDIOCESE OF BOSTON, INC., TO DISPENSE WITH
CONSENT TO ADOPTION.

Essex.  September 12, 1984. — October 19, 1984.

Present: BROWN, KASS, & SMITH, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Custody
of minor.

In a proceeding to dispense with the need for a mother's consent to the adop-
tion of her child, the judge was warranted in considering the alcoholism
and propensity to violence of the child's father, from whom the mother
had been divorced nine years earlier, where the father, who did not
participate in the proceedings, had been named in the petition, where
the father had maintained a relationship with the mother for the nine
years since he and the mother had been divorced, and where the father's
destructive influence had contributed to the mother's depression and
inability to cope with a needy child. [660]
In a proceeding to dispense with the need for a mother's consent to the
adoption of her child, the judge could properly consider the testimony
of a psychiatrist respecting emotional disorders experienced by the child
some one and a half years before trial, where the testimony was relevant
to a determination of the risks of permitting the mother to care for the
child. [660-661]
In a proceeding by a social service agency seeking to dispense with the need
for a mother's consent to the adoption of her child, a finding that the
mother was unfit to care for the child was not precluded by the fact that
the agency had returned the custody of a second child to the mother.
[661]
In a proceeding seeking to dispense with the need for a mother's consent to
the adoption of her child, there was clear and convincing evidence that
the mother was unfit to care for the child. [661-662]
In a proceeding to dispense with the need for a mother's consent to the adop-
tion of her child, the judge's reference in his findings to the unconstitu-
tional presumption contained in G. L. c. 210, § 3 (*c*), did not violate
the mother's rights, where the judge's findings made clear that he did
not rely on this presumption in determining to dispense with the mother's
consent to the adoption. [662-663]
In a proceeding to dispense with a mother's consent to the adoption of her
child, the judge's finding that severing the child's psychological attach-

ment with the proposed adoptive family would be seriously detrimental to the child's welfare, a finding for which there was no support in the record, did not invalidate the judge's determination that the mother's consent to the adoption was not required, where it was clear from the judge's other findings that he had based his decision on the mother's inability to care for the child. [663]

PETITION filed in the Essex Division of the Probate and Family Court Department on December 14, 1981.

The case was heard by *Rockett, J.*

*Linda E. Giles* for the mother.

*William J. Lundregan* for Catholic Charitable Bureau of the Archdiocese of Boston, Inc.

KASS, J. As required, the judge's findings "focused principally on the mother's fitness — her capacity to assume parental responsibility." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 392 Mass. 696, 700 (1984). In making his findings and arriving at the conclusion that "the biological parents[1] are currently unfit to assume responsibility for the child," the judge applied the correct standard, viz., that of clear and convincing evidence. *Id.* at 696-700. See *Santosky v. Kramer,* 455 U.S. 745 (1982).

Those findings, for which we find support in the record, include the following.[2] The child, Jimmy (three and a half years old at the time of trial), was one of three children born to the biological mother. An older daughter, born when the mother was seventeen, was placed for care with the mother's sister when that child was one and a half years old and, with the consent of the child's parents, was ultimately adopted by the mother's sister. An older son lived with the mother at the time of trial. He was then thirteen years old.

In February, 1981, when Jimmy was nineteen months old, he entered a therapeutic infant-toddler program. A referral to the program had been made by a social worker whom Catholic

---

[1] Only the mother answered the petition and appeared at the trial proceedings. It is the mother who brings this appeal.

[2] Occasionally, we have fleshed out the judge's findings with instructive, but not dispositive, detail garnered from undisputed portions of the record.

Family Services of Lynn had assigned to assist the mother and her family. The mother's participation in the infant-toddler classroom was irregular and of short duration. During most of her sessions at the infant-toddler program, the mother was preoccupied with, and overwhelmed by, crisis in her family and her own depression.

Conditions in the mother's apartment at the time of a visit on May 4, 1981, by Maura Dolan-Merrill, a social worker, were disheartening. Windows were broken, lead paint was chipping from the walls, the ceiling was falling down in the bathroom. There was no heat, electricity or hot water. There was a strong odor of urine. The visiting social worker proposed foster care for the older son — Jimmy having already been placed by the mother in foster care — and the mother agreed to the suggestion.[3] Squalor was not peculiar to the apartment visited on May 4, 1981. The mother was frequently obliged to move; crowded and substandard conditions continued to be the norm in the other locations.

Teachers at Jimmy's infant-toddler center, concerned about his arrested emotional development, referred the child to North Shore Children's Hospital. A psychiatrist, Dr. Orlov, described Jimmy, when examined on May 13, 1981, as "a depressed, tense, blank-faced child with little affect. He could not be engaged with many of the toys on the floor, although he started hoarding plastic toys which are made in the shape of foods . . . No language was elicited other than the names of foodstuffs." Dr. Orlov made a diagnosis of reactive attachment disorder of infancy. The disorder was attributable to severe neglect. Consistent collaboration between the school and outside caretakers would be necessary, in Dr. Orlov's view, to reverse the child's depression and disabilities.[4]

---

[3] That marked the third placement of Jimmy in foster care. The mother first placed him in foster care on December 14, 1979, and received his return on January 9, 1980. Jimmy was placed in foster care a second time from November 18, 1980, to December 23, 1980.

[4] Dr. Orlov had testified that Jimmy demonstrated environmental deprivation attributable to causes such as gross abandonment, multiple changes of residence, and a changing and disorganized environment. Because environ-

The mother has suffered from alcoholism and profound emotional instability. Her marriage to Jimmy's father, a violent, hot tempered, and frequently drunk man, was tumultuous. Divorce ended the marriage in 1973, but it did not end the relationship. Indeed, Jimmy was born on July 6, 1979. Although the mother claimed in her testimony to have put the father out of her life, she also conceded that she saw him weekly and had spent Christmas with him in the week preceding the trial. The judge made no express findings about the father's continuing role, but implicitly saw him as still in the picture.

As to her alcoholism, the mother had, at the time of trial, ceased drinking but required nightly attendance at Alcoholics Anonymous sessions to avoid relapsing.[5] The judge found that the mother "is so overwhelmed with her own problems that she is unable to provide the parenting necessary for James' growth and development."

At the time of the foster home placements in the late spring of 1981, the mother and father (he was then much in the picture) agreed to a treatment plan which had as its objective the return to their custody of the two boys.

In foster home settings, Jimmy became more relaxed and was no longer emotionally flat. The child, in December, 1982, was cheerful, happy, and verbalizing well.[6]

Immediately before and during trial, the mother lived in a rooming house, where she had one room which she shared

---

mental conditions had formed the character disorder, the child was vulnerable to adverse environments.

[5] Asked how she could care for Jimmy while at Alcoholics Anonymous, the mother replied that she could "take him with me or I could stay home or I could hire a baby sitter."

[6] Indeed, the social worker who supervised the pre-adoptive placement described Jimmy at the time of trial "as a very friendly, cheerful youngster. He's very verbal, talkative. He's interacting with the [foster] family. He shows affection towards them. He allows them to show affection back. He accepts the affection. He responds to limit setting in the family. . . . [H]is food attachment has lessened to a great degree. He's not presenting any sleep disturbances. There's no bed-wetting. And his overall appearance is one of a happy youngster." The record is compelling that Jimmy became distressed and anxious during visits with his mother, but the judge did not advert to this in his findings.

with her older son. The judge described the older son as a "self-sufficient [boy], who neither requires nor receives much care from his mother." The older boy has strong attachments to his mother and was unhappy in his foster home. Accordingly, Catholic Family Services recommended return of the older boy to the mother.

Upon the judge's findings, and resulting determination, the mother makes various attacks.

First, she asserts that the probate judge wrongly visited upon the mother the unfitness of the biological father. Since he was named in the petition, findings about the father, even though he did not appear, were not altogether irrelevant. Moreover, his alcoholism and propensity to violence and threats were part of the circumstances in which the unfortunate mother found herself. The biological father had been in and out of the family picture for nine years since he and the mother had been divorced. His alcoholism and violence had contributed to the mother's depression and inability to cope with a needy child. Reasonably, the judge could have found that the mother was not free of the father's destructive influence. On December 23, 1982, for example, an agency visit was cut short because the father was waiting outside the Catholic Family Services office. The father had threatened to kill two social workers from the agency, and employees of the agency were chary about having to deal with him.

Second, the mother challenges that the record satisfies the demanding clear and convincing evidence standard. Particularly, the mother calls in question reliance upon the testimony of Dr. Orlov because his diagnosis was made one-and-a-half years before trial. Dr. Orlov, however, did not purport to speak to the condition of Jimmy at the time of trial or to the current fitness of the mother. Rather he spoke to Jimmy's condition at about the time Jimmy was removed from the mother's custody. His diagnosis of reactive attachment disorder of infancy and testimony about the fragility of the child bear on the risks which would be taken by permitting the mother to care for the child. The psychiatrist emphasized the need for a primary caretaker who could observe Jimmy perceptively, could devote

major attention to him and who was not submerged in other difficulties. The judge could reasonably look to Dr. Orlov's testimony for its prognostic value. See *Custody of a Minor (No. 1),* 377 Mass. 876, 882-883 (1979); *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption,* 13 Mass. App. Ct. 936, 938 (1982). Current parental fitness is to some degree a function of the needs and consequent interests of the child. *Petition of New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. 631, 641 (1975). *Bezio* v. *Patenaude,* 381 Mass. 563, 576-577 (1980).

It does not follow, as the mother argues, that because Catholic Family Services returned the older boy to the mother that she cannot, clearly and convincingly, be unfit to be a parent. As we have observed, the judge could conclude that Jimmy is particularly vulnerable and in need of stability and attention. The older son, having survived, might be thought less susceptible to the consequences of parental neglect or beyond further harm. Parents may be fit to bring up one child and not fit to bring up another; the needs of one child may be different from those of another. *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 589 (1981). *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. 793, 799 (1983). To be sure, raising siblings together is important, but it is not dispositive. *Care and Protection of Three Minors,* 392 Mass. 704, 715 (1984).

Although it had been some time since social workers had made home visits to the mother, supervised visits continued as late as December 23, 1982, i.e., seven days before the trial, and the judge was not without evidence about how the mother was functioning currently and, significantly, how Jimmy reacted to her. Moreover, the mother took the stand and was examined about how she proposed to care for Jimmy, how she was coping with alcoholism, with the father, and what sort of life she expected to make for herself. His observation of the witness, as well as his evaluation of her testimony, constituted evidence which the judge could weigh in arriving at a conclusion about the mother's then current fitness.

The probate judge cited *Santosky* v. *Kramer,* 455 U.S. 745 (1982), and, thus, manifested awareness of the underlying premise in the recent cases: that biological parents have a fundamental right to the custody of their children. *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. at 799. With that premise the court must consider the paramount — and sometimes countervailing — consideration of the welfare of the child. *Ibid.,* quoting from *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 588. Taking into account these criteria, and upon review of the entire record, we think the judge's finding of current unfitness of the mother is supportable on a clear and convincing evidence standard.

One might wish for greater precision in the findings of the probate judge. Too often they were cast in the form of a summary of what witnesses said.[7] Since those summaries, however, were selective of what the record contained, we may safely conclude that the evidence the judge chose to summarize constituted the facts he found. The judge organized his findings in terms of what he learned about certain subjects and what he learned from the various witnesses.[8] There is absent any recapitulation which informs the reader exactly what factors the judge relied upon to arrive at his conclusion of current unfitness. As we are satisfied, however, that the judge informed himself correctly as to the governing principles and standard of proof and as the separate facts support the ultimate finding of unfitness, we see no need to remand the case for repair of the deficiencies to which we have adverted.

In his conclusions of law, the judge made reference to the presumption contained in G. L. c. 210, § 3(c), that the best interests of the child will be served by granting a petition for adoption if the child has been in the care of a licensed child care agency for more than one year. Such was the case with

---

[7] When they write findings, judges should articulate the facts they have found on the basis of the evidence, rather than rehearsing the evidence itself.

[8] The findings include a reference to a report by a guardian ad litem which recommended allowance of the petition.

Jimmy. The presumption was held unconstitutional in *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. at 802-803. As in that case, the judge made clear in his findings and further conclusions of law that he did not rely on the statutory presumption.

Among the conclusory findings (labelled "conclusions of law") made by the judge, there is one that severing of the psychological attachment with the proposed adoptive family would be seriously detrimental to the welfare of the child. That determination rests on no subsidiary finding of fact which the judge made, and the record would not support such a finding. Jimmy, at the time of trial, had only lived with the proposed adoptive family for six weeks. So heavy is the emphasis of the judge's subsidiary findings on the inability of the mother to care for Jimmy that we may conclude the reference to a bond between Jimmy and the adopting family was peripheral to the judge's decision.

*Judgment affirmed.*