ADOPTION OF SARAH.[1] No. 91-P-211. July 15, 1991. *Minor*, Adoption. *Parent and Child*, Adoption. *Adoption*, Dispensing with parent's consent.

Through an admirably pointed brief and argument, the biological father of Sarah urges that the Department of Social Services (DSS), when the father was incarcerated because of a parole violation, precipitously and, hence, unreasonably, altered a course leading to reunification between the father and the child. The father, the argument runs, could not so abruptly have changed from being currently fit to be the child's parent to being currently unfit. We think the facts found by the judge and further material contained in the record support the conclusion that the father is currently unfit to be the parent of the child and that the best interests of the child lie with adoption by the child's maternal uncle and his wife. We affirm the decree allowing the petition of DSS, under G. L. c. 210, § 3, to dispense with the consent of the biological parents to the adoption of Sarah.

When Sarah was born August 16, 1986, in Lawrence, her father was in a Federal prison in Indiana. There is no controversy that the biological mother was hopelessly incapable of caring for the baby and, indeed, she does not challenge the petition under G. L. c. 210, § 3. From an age slightly shy of one month, the child has been in the custody of others pursuant to DSS placements: first with the maternal grandmother and, upon that woman's death on October 30, 1987 (when Sarah was fourteen months old), with a maternal uncle. Sarah has lived as part of the maternal uncle's family unit since. The father and DSS first made contact about the child on April 27, 1988, when the child was twenty months old. The father's prison venue had then changed to California, the State in which the father's brother lived, and it was there that the father proposed to work and establish a home for the little girl.

At the request of DSS, a social worker from the county of Los Angeles department of children's services visited the home of the father's brother to evaluate it as a possible placement for the child. This was in November, 1988, and the father, released from prison on parole, now lived with his brother and sister-in-law in El Monte, California. DSS regarded the report from California as favorable and, as a next step, urged a visit by the father to his daughter. That visit — the father flew east at his expense — occurred in January, 1989, when Sarah was two years and five months old. Though only a few days long, the visit went well: the father acted appropriately with the child, brought little gifts, and so forth.

Soon after returning to California, however, the father lost his job and, possibly in consequence, resumed the use of drugs, a relapse spotted in a urine test. This was a violation of the father's probation and he wound up back in prison. Starting with March, 1989, DSS heard no more from the father. For the fourteen months before trial of the petition to dispense with

---

[1]In accordance with our practice in adoption, care and protection, and custody cases, the name of the child is fictitious.

consent to adoption (that trial took place May 10, 1990), there was no contact whatever between father and child, whether by letter, card, or telephone.

Correctly, the father calls to attention that the fact of his incarceration does not alone automatically categorize him as an unfit parent. See *Petition of Boston Children's Serv. Assn. to Dispense With Consent to Adoption*, 20 Mass. App. Ct. 566, 573 (1985). In that case the mother had lived with and cared for the children and when she confronted imprisonment, she made arrangements for the care of the children and made every effort to stay in touch with them. By contrast, Sarah's biological father has been in touch only sporadically. We do not think that DSS's optimism and encouragement of the father, when he was out of prison, inhibits DSS from ultimately deciding that the father cannot, when all is said and done, perform the role of a parent. DSS was entitled to be greatly disappointed when the father was returned to prison and the proposed parental home in California evaporated (the father's brother having moved to Florida). One may feel compassion for the father's desire to be a father to his daughter and yet recognize that except for an expression of desire and hope, he offers no realistic prospect of providing a home where Sarah may live and be cared for. Since the age of fourteen months, Sarah has lived in the home of her maternal uncle and has prospered there. At this writing, she is close to five years old. In the circumstances, the decision of DSS to proceed with adoption was not precipitous but an adjustment to new realities.

It was the task of the Probate Court judge to assess whether the biological parents were unfit as of the time the judge was making that judgment. *Bezio* v. *Patenaude*, 381 Mass. 563, 577 (1980). *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 656, 657 (1984). Evidence to support such a finding must be clear and convincing. *Santosky* v. *Kramer*, 455 U.S. 745, 769 (1982). Current parental unfitness is to some degree a function of the needs and consequent interests of the child. *Petition of New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 641 (1975). *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption*, *supra* at 661. See *Adoption of Gwendolyn*, 29 Mass. App. Ct. 130, 135-136 (1990). On review, we think that the probate judge made his findings and arrived at his conclusions on the basis of the prescribed legal standards.

*Decree affirmed.*

*Linda E. Giles* for the father.
*Mary E. Murphy* for Department of Social Services.

