CARE AND PROTECTION OF OLGA
(and two companion cases[1]).

No. 02-P-595.

Plymouth. October 3, 2002. - April 23, 2003.

Present: LENK, BERRY, & McHUGH, JJ.

*Practice, Civil,* Findings by judge. *Parent and Child,* Adoption, Care and protection of minor, Dispensing with parent's consent to adoption. *Adoption,* Care and protection, Dispensing with parent's consent. *Evidence,* Child custody proceeding.

Discussion of a judge's proper use of a party's proposed findings of fact, and statement that a judge's ultimate findings must recite a consideration of the evidence and of the consequences that, in the judge's view, the evidence commanded. [822-824]

In proceedings to dispense with consent to adoption of two minors and for custody of a third minor, there was clear and convincing evidence of their parents' unfitness at the time of trial to assume the duties and responsibilities required of a parent where, although two of the judge's findings of fact were clearly erroneous, the other findings were either supported by the evidence or were immaterial errors, and the two clearly erroneous findings, considered singly or in the aggregate, were not central to the ultimate conclusion of unfitness. [824-831]

.

PETITION filed in the Brockton Division of the Juvenile Court Department on February 25, 1998.

The case was heard by *Robert F. Murray,* J.

*Henry C. Porter* for Olga.

*Deborah W. Kirchwey* for the mother.

*R. Scott Miller, Jr.,* for the father.

*Christopher E. Lee* for Department of Social Services.

*Andrew R. Gustafson* for Joseph & another.

McHUGH, J. Parental cocaine addiction and domestic violence led the Department of Social Services (department) to file a

[1]Adoption of Joseph and Adoption of Daniel. All the children's names are pseudonyms.

petition for care and protection of Olga, then twelve, and her brothers, Joseph, then four, and Daniel, then two and one-half, in February, 1998. The department obtained custody of the children and placed them in a foster home. Ultimately, the department sought a dispensation from parental consent to adoption of the two boys and custody of Olga until she reached the age of eighteen. Following a ten-day trial, a judge granted the petition. From the resulting judgment and decrees, the parents appeal.[2] We affirm.

A brief overview of the facts, supplemented later by more detail, provides an appropriate context for the parents' claims of error. The mother, then twenty-eight, and the father, then thirty-one, were married in 1985. Olga was born on May 11, 1986. She was followed, on February 19, 1994, by Joseph and then by Daniel on September 3, 1995. The mother was an MBTA bus driver, and the father worked as a substance abuse counselor and in various community-based programs. Family life, however, was characterized by serious domestic violence and by the parents' progressively debilitating drug addiction. The mother ultimately lost her job with the MBTA as a result of her drug use, and the father was sentenced to jail for assaulting her. The family upheaval had a profoundly deleterious effect on the three children, all of whom were severely troubled by the time the trial began.

The parents' first claim of error is procedural and focuses on the trial court's findings of fact and conclusions of law. Those findings and conclusions consume fifty-five single-spaced pages, fifty of which contain findings of fact. The recited facts are detailed and, as their sheer volume suggests, comprehensive. All but the last page, however, are an essentially verbatim adoption of the requests for findings of fact and conclusions of law the department submitted at the close of trial, even down to typographical errors the department's submission contained.

---

[2]Olga, represented by counsel, was involved in all proceedings and consistently sought to be reunited with her parents. She joined her parents in appealing from a judgment committing her to the department's custody until the age of eighteen. On the day set for oral argument, however, she withdrew that appeal. Consequently, we do not consider her claims of error, although we do consider claims of the parents that center on the portion of the judgment awarding the department custody of her.

We have criticized in the past wholesale adoption of findings proposed by one party to the litigation, and we do so again. See *Adoption of Hank*, 52 Mass. App. Ct. 689, 691-692 (2001). Proceedings aimed at dispensing with parental consent to adoption involve high stakes and deeply important personal rights. See *Adoption of Katharine*, 42 Mass. App. Ct. 25, 27 (1997). It is critical, therefore, that the judge's decision reflects "careful factual inspection [of the evidence] and specific and detailed findings" by the judge. *Adoption of Harriet*, 29 Mass. App. Ct. 111, 112 (1990).

To be sure, pressed by a volume of cases filled with complex factual issues, a busy trial judge may be tempted occasionally to determine the outcome at the trial's end and then adopt the findings proposed by the party he or she has decided will emerge as the victor. Succumbing to that temptation invites error, even as to outcome, that careful consideration of the evidence would likely reveal. Moreover, simply adopting what one side has proposed may lead all parties at least to wonder whether the arguments they made and the evidence they offered were considered before the final decision was reached and may lead an appellate court to question whether deference to the imported findings respects the trial judge's weighing and sifting or simply glorifies an illusion. See generally *Adoption of Stuart*, 39 Mass. App. Ct. 380, 381-382 (1995). Succumbing to that temptation, in other words, substantially diminishes the integrity of the trial process and the respect with which the final result is viewed.

Proper use of the parties' proposed findings can, and often does, substantially facilitate the opinion-writing process. But that proper use should evince fact-finding by the judge, not fact-finding by proxy. No formula can describe how to make that showing in every case, or even in most. However the judge chooses to do it, use of the parties' proposals should show the reader that the judge has given careful consideration to all evidence pertinent to the criteria upon which termination of parental rights depends. See *Custody of Two Minors*, 396 Mass. 610, 620 n.6 (1986). Cf. *Parrish v. Parrish*, 30 Mass. App. Ct. 78, 88 (1991).

That said, the traditional view is that even findings lifted wholesale from those a party proposes "are not to be rejected

out-of-hand, and they will stand if supported by evidence." *First Pa. Mort. Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 622 n.12 (1985), quoting from *United States* v. *El Paso Natural Gas Co.*, 376 U.S. 651, 656 (1964). "A finding is clearly erroneous [and thus not supported by evidence] when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.' " *Custody of Eleanor*, 414 Mass. 795, 799 (1993), quoting from *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977). While "[t]he standard of review does not change [under such circumstances,] . . . the findings are 'subjected to stricter scrutiny by an appellate court.' " *Adoption of Hank*, 52 Mass. App. Ct. at 693, quoting from *Cormier* v. *Carty*, 381 Mass. 234, 237 (1980). See *Edinburg* v. *Cavers*, 22 Mass. App. Ct. 212, 218-219 (1986).

There may be a case in which sweeping adoption of the parties' findings raises such substantial questions that the traditional view must give way. This is not that case. The weight of the evidence presented at trial strongly, if not overwhelmingly, supported the judge's decision. Moreover, as shown by the quotation with which our opinion ends, the judge's ultimate findings recited his own consideration of the evidence and of the consequences that, in his view, the evidence commanded. We therefore proceed with the traditional principles in mind.

The parents' first substantive claim is that several of the findings of fact are clearly erroneous either because they are unsupported by any evidence or because they fail to give weight to contrary evidence, sometimes contrary evidence offered by the very witness on whom the judge relied for the challenged finding.[3] Our review reveals that two of the judge's findings are

---

[3]When the judge has simply adopted a party's proposed findings, this kind of claim puts a particular strain on appellate deference to the trial judge's fact-finding. See *Adoption of Hugo*, 428 Mass. 219, 225 (1998), cert. denied sub nom. *Hugo P.* v. *George P.*, 526 U.S. 1034 (1999). Ordinarily, "[i]f the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the [appellate court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact-

clearly erroneous.[4] The other challenged findings either are supported by the evidence[5] or are immaterial errors.[6] The two clearly erroneous findings, considered singly or in the aggregate, are not central to the ultimate conclusion of unfitness. Even without those findings, that conclusion has clear and convincing evidentiary support. See *Petition of the Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 656, 662 (1984). Indeed, that conclusion would remain even if the findings challenged for failure to include evidence favorable to the parents were amended to include that evidence.

The judgment just expressed is an obvious rejection of the parents' third and final claim, i.e., that the record does not

finder's choice between them cannot be clearly erroneous." *Anderson* v. *Bessemer City*, 470 U.S. 564, 573-574 (1985). Therefore, "[t]he judge's findings of fact, wherever contrary to the defendants' evidence or requests for findings of fact, import his rejection of their position on the factual issues." *Ricky Smith Pontiac, Inc.* v. *Subaru of New England, Inc.*, 14 Mass. App. Ct. 396, 405 (1982). When adopted findings silently reject contrary evidence, it is difficult to know whether the judge actively chose to reject that evidence. In this case, we need not attempt that determination, for even if all of the challenged findings were amended to include the evidence the father and mother desire, the end result would be the same.

[4]Finding 135 states that a social worker stopped Daniel's sexualized behavior on a visit that occurred on February 22, 2000, because the mother failed to do so. In fact, however, the social worker testified that the mother stopped the behavior. Finding 214 states in part that the father thought apologies and paying more attention to Joseph's problems would resolve those problems. In fact, the father testified that resolution of both Joseph and Daniel's problems would require therapy.

[5]In that category are findings 46, 134, 174, 176, 187, 189, 199, 232, and 241 and the conclusion pertaining to years of exposure to abuse. Findings 46, 134, 174, 176, 187, and 241 suffer from the problems discussed in note 3, *supra*. The existence of evidence contrary to those findings do not, of course, undercut their validity.

[6]Finding 200 states that the mother was not permitted to have a certificate of completion for a program she attended and completed. In fact, the evidence only shows that she was not allowed to attend the graduation ceremony because of her inability to get along with other program participants. Finding 202 states that the mother continues to deny that Daniel witnessed the father's knife assault on her. In fact, she denies that Daniel saw the assault but agrees that he heard it. Finding 213 states that the father thought Olga was being punished for the behavior in which he and his wife had engaged. In fact, the father testified that Olga believed that she was being punished for her parents' behavior and that her father agreed with her.

contain clear and convincing evidence of their unfitness at the time of trial. See, e.g., *Adoption of Don*, 435 Mass. 158, 164 (2001). Little would be gained by restating here the extensive findings or the evidence on which the findings are based. A summary makes the essential points.

The department first encountered the family in November of 1997 when a police officer discovered Joseph and Daniel unattended in an automobile outside the Dorchester District Court. Unknown to the department at that time, both the mother and the father had extremely serious drug problems and serious domestic violence had been a feature of their family life for years.

Both problems soon became visible. In February of 1998, the father chased the mother around the house with a knife in an effort to stab her. Joseph and Daniel were present at the time. The episode ended when police arrived, arrested the father, removed the mother to the hospital for treatment of her injuries, and discovered the parents' drug paraphernalia strewn about their apartment.

About three weeks later, the mother asked a neighbor, who apparently worked with her at the MBTA, if she would care for the three children for a while. The neighbor ultimately took charge of the children, who were poorly clothed and otherwise in a state of disarray, while the mother disappeared to a crack house. The neighbor then attempted to enroll the mother in an MBTA-sponsored drug treatment plan. Her effort ultimately failed, and she notified the department of the children's plight. At that point, the department intervened, filed a care and protection petition, obtained custody of the children on an emergency basis in late February, 1998, and placed them with the neighbor as a foster parent. The mother and the father filed stipulations of unfitness in the care and protection proceeding in December, 1998. Both before and after the parents filed those stipulations, the department provided them with service plans aimed at reuniting the family.

From February, 1998, through November of 1999, the mother participated in approximately ten different programs focusing on her drug addiction and her parenting skills. Her progress through those programs can best be described as stormy. She

was discharged from several for failing to follow rules, voluntarily left others before completing them, and was discharged from at least one because the program staff concluded that she was not ready to be reunited with her children. In the middle of one program, she relapsed, began using cocaine again, and as a consequence, was fired from her job at the MBTA. Ultimately, however, she completed the Steppingstone program, a residential drug abuse program that also offered individual counseling and counseling for domestic violence, in November of 1999.[7]

The father, who was forty-three years of age when arrested in February of 1998, had been using drugs of one kind or another since he was ten and, perhaps as a consequence, had an extensive criminal record. At the time of his February arrest, he was on probation for a 1995 conviction of two counts of assault and battery with a dangerous weapon (the weapons being a stick and a knife), assault and battery, and domestic abuse. On June 6, 1998, his probation was revoked, and he was sentenced to two years in a house of correction.[8] He was released from jail on October 9, 1999, five months before trial. While in jail he maintained contact with the mother and the children, although quite often Joseph was very opposed to seeing him, and completed a number of programs dealing with drug addiction and domestic abuse.

At the time of trial, both the mother and the father were involved in couples therapy. In addition, the mother was being treated individually for posttraumatic stress disorder and depression. The couples therapy focused on the mother and father's interpersonal relations, for the therapist was of the opinion that they were not yet ready to deal with issues involving their relationship with their children or with parenting in general. Virtually all of the mother's energy was consumed by her efforts to deal with her own stress and depression. The mother was living with her brother-in-law, and the father was living at the Cardinal Medeiros program, a residential facility

---

[7]As noted earlier, the mother was not permitted to attend the graduation ceremonies because of difficulties she was having with other program participants.

[8]He received a concurrent two-year sentence for the February offenses that produced the revocation.

for the employed homeless. The mother and father planned to be reunited in about six months, but had no definite blueprint for how or where.

The effects of drug abuse and domestic violence on Olga, Daniel, and Joseph were dramatic, and at the time of trial, all three were profoundly troubled. Olga was nearly fourteen when the trial began. She had had a history of aggressive behavior at home and at school, with frequent school suspensions as a result of fistfights with boys. Approximately a month and one-half after the department placed Olga, Joseph, and Daniel with the foster mother, the foster mother asked that Olga be removed from the foster home because she refused to obey any household rules and refused to go to school. The department placed her in a new foster home and reenrolled her in a school equipped to deal with her aggressive and oppositional behavior.

In July of 1998, Olga was reunited with her mother, who was then in a residential treatment program for her drug problem. Shortly thereafter, however, the mother had the relapse discussed earlier, a relapse that led to her termination from the program. Olga was temporarily returned to foster care and then eventually transferred to a Volunteers of America (VOA) residential program. Soon after her placement with VOA, Olga experienced her second psychiatric admission to the Bournwood Hospital where she remained for approximately one month. After her discharge from the hospital, Olga returned to school and the VOA program. Because of the depth of her needs and the complexity of her problems, the department assigned two social workers to work with her. While at VOA, she ran away several times and, at school, pushed a teacher against the side of a bus, causing the teacher to fall off of the curb. Ultimately, Olga was expelled from school, and the department placed her in the New Leaf program, a more structured residential program than VOA.

By the time of trial, Olga was still living at the New Leaf program. Between the time of her placement in November, 1999, and the time the trial began in March, 2000, she had run away from the program on seven occasions. Moreover, she continued to get suspended from school, and although she was required to return to the New Leaf program promptly after school ended each day, she frequently stayed out until 8 or 9

P.M.[9] Neither the mother nor the father were able to get Olga to tell them where she went when she ran away, nor were they able to persuade her not to do so.

Daniel, four and one-half years old when the trial started, suffered from posttraumatic stress disorder and alepecia, a medical condition exacerbated by stress, which caused his hair to fall out. He continued to live with the neighbor, who remained his foster mother. Not long before trial, Daniel had been asked to leave a day care center for violent and sexualized behavior. At home, he had nightmares every other night, resisted going to bed, got up early, and acted out by unrolling all of the toilet paper, using hair gel, and opening all the cleaning supplies. In therapy, when asked to play with dolls, he always placed the dolls in the role of bad children whom he punished by hitting and threatening to break their legs. He required a highly structured environment with a great deal of focus on his needs, and the evidence suggested that he would require continued treatment for his posttraumatic stress disorder for a period of two to five years.

Joseph, six years old when trial began, had an even more serious set of problems. He, too, had been diagnosed with posttraumatic stress disorder. In addition, he had been diagnosed with attention deficit hyperactivity disorder, was extremely assaultive, and displayed highly sexualized behavior. At day care, while he was living with the foster mother, Joseph hit other children, took toys from them, hit the teacher, screamed, used profanity, and threw toys at the teacher and the other children. Ultimately, his behavior became more than the foster mother could handle,[10] and shortly before trial, he was placed at Bridge Home, an emergency shelter and assessment unit the department maintained. While there, he continued his aggressive acts and displayed as well behavior that was highly sexual and self-destructive.

Because of his difficulties, Joseph required a high degree of specialized, focused care, and the evidence suggested that he

[9]She also made threats toward staff members and teachers, and had to be temporarily removed from the program at least once.

[10]The foster mother testified that, while living with her, Joseph ripped up clothes, bed covers, his bedspread, and wallpaper.

would continue to require that care for an extended period of time. Among the essential components of that care was placement in a home where no other children were present so that all of the attention could be devoted to him.

Fairly construed, the record reveals a family that was profoundly affected by drug abuse and domestic violence, the effects of which left the three children with an intense need for care, attention, and therapy. During the approximately two years between the time of the department's initial intervention and the time of trial, the parents had made progress in dealing with their difficulties. The mother's progress was aided by assistance the department provided and the father's was aided largely by the assistance he received while incarcerated. Although that progress, and its impact on the likelihood of future fitness, require recognition, see *Adoption of Paula*, 420 Mass. 716, 731 (1995), that progress does not preclude consideration of past behavior as a means of predicting the likely future. *Id.* at 729. Cf. *Adoption of Rhona, ante* 479, 485 (2003). Overall, the essential question remains whether the parents, or either of them, were fit at the time of trial "to assume the duties and responsibilities required of a parent," *Adoption of Mary*, 414 Mass. 705, 710 (1993), taking into account their potential for future growth and improvement. See, e.g., *Adoption of Carlos*, 413 Mass. 339, 350 (1992). Beyond that, the assessment of parental fitness must focus on the children actually involved in the proceedings, with their specific needs, interests, and requirements, and not on some hypothetical child or children. See *Adoption of Frederick*, 405 Mass. 1, 7-8 (1989); *Adoption of Vito*, 431 Mass. 550, 566 (2000). In the end, the children's best interests are of paramount importance. *Adoption of Willow*, 433 Mass. 636, 644-645 (2001).

As he ended his findings and conclusions, the trial judge, in original language not taken from proposals submitted by any party, said as follows:

> "[The mother] has had more than sufficient opportunity to take part in various and numerous drug treatment programs, domestic violence classes and parental learning classes. Based on the credible evidence adduced in this case, I

conclude that [the mother] does not have any real appreciation of the extent of the damage inflicted on her children by years of neglect and abuse. Moreover, she fails to comprehend how emotionally intensive and time consuming future supervision and guidance of each of these children will [be]. The evidence is replete with too many instances of her complete lack of ability to manage her children and to protect them from physical and emotional abuse.

"In addition, [the mother] has for all practical purposes reunited with [the father] notwithstanding his long history of violence towards her. This long, sad history coupled with her children's profound needs for specialized treatment and supervision [render her] currently unfit to parent any of them.

"[The father] for years exposed his children to severe and protracted domestic violence, drug abuse and neglect which have [inflicted] tremendous damage on them.

"I believe [that the father] is sincere in his assertion that he loves his children [and] wants them with him and would continue to engage in services to assist him. However, [the father], given his history of violence and substance abuse, his very limited understanding of the nature and extent of his children's trauma and his lack of ability to control their behavior or meet their emotional needs and the children's continuing and indefinite need for specialized care and treatment, is presently unfit to parent any of them."

Unfortunately, those conclusions fully reflect what this record, on clear and convincing evidence, unequivocally reveals.

*Judgment affirmed as to Olga.*

*Decrees affirmed as to Joseph and Daniel.*