NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-465

ADOPTION OF SPENCER.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother and father of Spencer appeal from decrees entered in the Juvenile Court terminating their parental rights. The mother contends that the judge's decision to terminate her parental rights was based on erroneous factual findings and was not supported by clear and convincing evidence.  The father argues that the judge improperly placed the burden of proof on him to show that he was fit to assume parental responsibility for Spencer, that his incarceration status unfairly prejudiced him and tainted the judge's finding of unfitness, and that evidence regarding substance abuse and domestic violence was stale.  We affirm.

Background.  The Department of Children and Families (department) commenced these proceedings after receiving numerous reports of neglect arising from the parents' escalating

_____

[1] A pseudonym.

issues of substance abuse and domestic violence.  This was not the mother's first interaction with the department.  She first came to the department's attention in 2006 when the paternal grandfather of her first child reported neglect caused by substance abuse and domestic violence.[2]  The department determined that the report was unsupported, but for the next five years the department continued to receive similar reports of neglect.  During this time, the mother admitted that she struggled to remain sober but denied instances of domestic violence.  Ultimately, that child's paternal grandfather obtained guardianship, and the case was closed, in 2011.

The mother and Spencer's father started dating in 2013 and began living together when the mother became pregnant with Spencer, her second child.  The department became involved the day after Spencer's birth in October 2016.  The mother admitted to using heroin while pregnant, and when Spencer was born he tested positive for Subutex and the mother tested positive for Buprenorphine.  The department's investigation revealed that the mother failed to report her drug abuse to her prenatal care provider and that no drug screens were conducted.  Although the department determined that the mother and father were actively engaged in treatment, it nonetheless opened a case because of

---

[2] At the time, the mother lived with the first child's father, who is not Spencer's father.

2

the parents' longstanding history of substance abuse and relapse.

Following Spencer's birth, the father became jealous, possessive, and abusive toward the mother. Less than a year after the department opened the case, an anonymous person filed a report alleging neglect of Spencer by the father based on domestic violence. The mother admitted that the father hit her while she was holding then ten month old Spencer, and the father also admitted to hitting her. Because of this dispute, the mother terminated her relationship with the father. They were not separated for long, however; the mother and Spencer moved back in with the father after a few months.

Thereafter, another report alleging the parents' neglect was filed after Quincy police officers found the father and mother arguing loudly in their vehicle with Spencer in the back seat. The department's investigation revealed that the parents were arguing about a text message that the father found on the mother's cell phone, but the argument was reportedly verbal, and neither party appeared to be under the influence. The parents were recommended couples counseling but failed to engage in any recommended services.

Another incident was reported the following month after the mother entered a convenience store requesting police assistance. The mother and father were on their way to the train station

3

with Spencer when they began to argue.  During their argument, the father became so agitated that the mother feared for her safety.  The Weymouth police responded to a call, and the father, who stated that he had not slept in three days because he was taking Adderall, was transported by ambulance to Massachusetts General Hospital.  The next day, the mother called the department, reporting that the father had arrived at her apartment the night before and tried to get in.  She denied letting him in or any physical abuse, but stated that she asked a neighbor to call the police.  She also stated that Spencer was home but did not witness anything.  The department's investigation later revealed, and the mother admitted, that she failed to report that the argument in fact did become physical, that the father pulled hair out of her head, and that Spencer was present and exposed to the argument.

After this incident, the mother took steps toward engaging in domestic violence services by applying for emergency shelter placement, obtaining housing, and applying for an abuse prevention order against the father.[3]  Yet, the mother could not stay away from the father and ended up losing her housing funds and getting evicted after an altercation with the father that

---

[3] An abuse prevention order was issued, presumably on an ex parte basis, but the mother failed to renew it when it expired two weeks later.

required police involvement. The mother admitted to the department that she did not renew the abuse prevention order because the father was "a good person and a good father." The department encouraged the mother to seek domestic violence services and obtain another restraining order, but the mother initially rejected such suggestions. A few months later, she did obtain a three-month restraining order against the father. Despite the fact the father had been ordered to stay away from the mother, the two of them were arrested for shoplifting approximately $1,500 worth of merchandise from a department store in Hingham.

The mother and father continued to see each other. Not long after the shoplifting arrest, Spencer's maternal grandmother called the police to report that the father had been physically violent against the mother. The police found the mother at her home with a black eye and bloody nose. The mother stated that the father, while in Spencer's presence, "head-butted" her and punched her in the face. She also stated that the father had strangled her to the point that she thought she would die. The father, who was present when the police arrived, stated, "I was probably up for five or six days because of cocaine," and admitted attacking the mother. He was arrested and charged with domestic assault and battery, strangulation, violation of a restraining order, and possession of controlled

substances, ultimately resulting in a substantial prison sentence. The mother, who was pregnant at the time, had to be transported to the hospital because her eye was so badly damaged.

After this incident, the department determined that Spencer was in need of care and protection, filed the instant petition, and was granted custody. Spencer was placed with a foster mother, who is the preadoptive parent.

The department developed service plans for the mother and the father that targeted the skills they would need to care for Spencer. At the time, the father was being held at a house of correction, so the department met with the father there to review the service plan. He did not want Spencer to visit him while he was incarcerated, and although he had the ability to do so, he failed to communicate with Spencer, or the department, for the remainder of his prison term.

The mother complied with her service plan. She was granted weekly supervised visits with Spencer, which she always attended, and she worked with the department to follow its recommendations. Due to her compliance with her service plan and cooperation with the department, Spencer was placed back into the mother's care after nine months. The following month, however, the department received a report alleging neglect of Spencer arising out of another shoplifting incident. This time

the police responded to a convenience store where the mother had allowed Spencer to climb on the shelves to distract the clerk while she attempted to carry stolen merchandise out of the store. The department conducted an unannounced home visit, during which the social worker found a discrepancy in the pill count of the mother's Subutex prescription and new track marks on the mother's arms. The mother denied that the marks were track marks, but had no explanation for their origin. The department again removed Spencer from the mother's care and placed him back with the foster mother. The department subsequently discovered an unreported police response and relapse that had occurred before Spencer was returned to the mother's care. The report stated that the mother was found passed out in the driver's seat of a car in a parking lot and that white powder residue and an uncapped hypodermic needle were found in the front seat area. The department held a permanency planning conference and changed Spencer's permanency goal to adoption. After the department changed its permanency goal for Spencer, the mother failed to stay sober. She was found unconscious due to an overdose and had to be revived with Narcan. She failed to report this incident to the department and denied it when confronted, claiming that it was her sister who had overdosed. The mother also reported receiving services when she was not and failed to report a domestic disturbance

involving a former boyfriend because she hoped it would "slip through the cracks."

After trial, the judge found that the department had demonstrated, by clear and convincing evidence, that the mother and the father were both unfit to parent Spencer and that his best interests would be served by termination of their parental rights.  The judge committed Spencer to the permanent custody of the department and ordered that the mother have bimonthly visits with Spencer prior to adoption and two yearly visits thereafter.  The judge denied the father's request for posttermination and postadoption visits.  Both parents appeal.

Discussion.  1.  The mother's appeal.  The judge concluded that the mother's persistent problems with domestic violence, substance abuse, lack of stable housing, and lack of stable employment rendered her an unfit parent, and that these shortcomings would continue into the future.  The mother contends that the judge erred by not crediting her compliance with her service plans, and that several of the judge's findings were not supported by the evidence.

"In determining whether to dispense with parental consent to adoption, a judge must 'evaluate whether the [parent is] able to assume the duties and responsibilities required of a parent and whether dispensing with the need for parental consent will be in the best interests of the children.'"  Adoption of Nancy,

443 Mass. 512, 514 (2005), quoting Adoption of Mary, 414 Mass. 705, 710 (1993). See G. L. c. 210, § 3; Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). The judge must conduct a two-part analysis: the judge must first determine "parental unfitness by clear and convincing evidence," and "[a]fter ascertaining unfitness, the judge must determine whether . . . it would be in the child's best interests to end all legal relations between parent and child." Adoption of Nancy, supra at 515. The two inquiries "are not separate and distinct, but 'reflect different degrees of emphasis on the same factors.'" Id., quoting Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 641 (1975). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).

Although the mother claims that the judge ignored substantial documentary and testimonial evidence of her compliance with services, the judge acknowledged in her conclusions of law that the mother "ha[d] recently made some positive gains." The judge continued, however, to note that "the length of time has been at Spencer's expense. Spencer

9

deserves and requires permanency.  Mother's shortcomings are likely to continue undiminished into the future."  The judge was not required to find that the mother was fit simply because she started to make some positive gains.  See Care & Protection of Olga, 57 Mass. App. Ct. 821, 830 (2003) ("progress does not preclude consideration of past behavior as a means of predicting the likely future"); Adoption of Lorna, 46 Mass. App. Ct. 134, 143 (1999) ("judge was not obliged to believe that the parenting skills of the mother . . . had improved simply because of [her] recent cooperation with the department").

The mother further contends that several of the judge's factual findings were clearly erroneous.  "A finding is clearly erroneous [and thus not supported by evidence] when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  Custody of Eleanor, 414 Mass. 795, 799 (1993), quoting Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977).  The mother claims that the judge erroneously concluded that she struggled to maintain stable accessible housing; that she was resistant, uncooperative, and inconsistent with the department; and that she continued to engage in a pattern of relationships ridden with domestic violence.  The evidence, however, strongly supported the judge's decision.

10

While the mother is correct that the department did not consider housing to be an issue, the judge's conclusion that the mother lacked stable housing was fully supported. The mother repeatedly had to move back to the maternal grandmother's home because, on at least two occasions, she was evicted from her own apartment due to domestic violence incidents. Moreover, the mother's inconsistent and unsuccessful attempts to comply with services are well documented. The judge found not only that the mother failed to comply with services, but also that she lied about receiving such services.

Concerning the domestic violence, the mother claims that her past history did not represent her current ability to parent Spencer and that she had cut all ties with the father. The judge, however, reasonably concluded that the mother failed to effectively address her domestic violence victimization, which, the record reveals, profoundly affected the mother, as well as Spencer. The mother's relationship with the father of her first child was fraught with domestic violence, which contributed to her losing custody of that child. The mother subsequently engaged in a relationship with Spencer's father, and although domestic violence characterized their relationship from the beginning, the mother continued to allow the father into her and Spencer's life. Ultimately, the father had to be arrested following a "vicious" attack against her. After the mother cut

11

all ties with the father, she started dating someone else who had a history of domestic violence and a permanent abuse prevention order against him,[4] and at least one domestic disturbance between them required police intervention.

The judge found that "[b]oth Mother and Father have criminal histories that have rendered them unavailable due to incarceration." The mother also argues that the judge erred in concluding that incarceration rendered her unavailable to parent Spencer because she was never incarcerated after Spencer's birth. While the mother is correct that this finding was erroneous with respect to her, the mother did continue to engage in criminal conduct after Spencer was born. Moreover, the finding regarding the mother's incarceration was not central to the judge's ultimate conclusion. Even without this finding, the mother's unfitness has clear and convincing evidentiary support. See Care & Protection of Olga, 57 Mass. App. Ct. at 825; Petition of the Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption, 18 Mass. App. Ct. 656, 662 (1984).

Finally, the mother argues that even if unfitness was proven, the judge erred in terminating her parental rights

---

[4] Showing little appreciation for how domestic violence might affect her fitness as a parent, at trial the mother stated, "It's not my business if my ex-boyfriend has a lifetime restraining order against him."

because of her strong bond with Spencer.  We discern no abuse of discretion in the judge's determination that the mother's longstanding issues with substance abuse, domestic violence, and providing a stable home environment were likely to continue in the future such that termination of parental rights was in Spencer's best interests.  "It is in the best interests of [Spencer] to have [a parent] who can and who will, on a consistent longterm basis, assume all parental responsibilities and who can provide [Spencer] with the stable and continuous care and nurturing [he] needs and will continue to need as a child."  Adoption of Gwendolyn, 29 Mass. App. Ct. 130, 136 (1990).

2.  The father's appeal.  a.  Burden shifting.  The father argues that rather than placing the burden of proof on the department to establish by clear and convincing evidence that he was unfit, the judge shifted the burden to him to "demonstrate" fitness.  He points to three instances in the judge's conclusions of law where she stated that the parents had failed to "demonstrate" insight into Spencer's needs, that they had a care plan, or that they had "the ability, fitness and readiness . . . to assume parental responsibility," and to two instances where the judge said that there was "no evidence" of a bond between the father and Spencer.  Due process and fundamental fairness require that the department meet its burden of proof

13

when seeking to terminate parental rights.  See Adoption of Parker, 77 Mass. App. Ct. 619, 623 (2010).  Given the liberty interests at stake, "it is never permissible to shift the burden of proof to the respondent parent.  Care & Protection of Ian, 46 Mass. App. Ct. 615, 619 (1999)."  Care & Protection of Erin, 443 Mass. 567, 571 (2005).

There was no burden shifting.  The judge's memorandum of decision made clear that she understood that the burden of proving unfitness was on the department.  Indeed, her pertinent finding in this regard was, "Following trial, this Court finds that the Department has demonstrated, by clear and convincing evidence, that Mother and Father are both unfit to parent the child."  The department presented abundant evidence of the father's unfitness, and the judge's extensive findings show careful attention to the evidence.  The judge found that the father had a history of mental illness, a long history of substance abuse, a substantial criminal record, and that the father was abusive against the mother.  In context, despite the handful of references on which the father relies, the judge did not shift the burden of proof.  See Adoption of Terrence, 57 Mass. App. Ct. 832, 836 (2003) (judge's repeated uses of phrase "has not demonstrated" "were summations of the evidence presented; read in context, they plainly do not refer to the ultimate burden of proof resting on the mother").

14

b.  The father's unfitness.  "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion."  Adoption of Ilona, 459 Mass. at 59.

The father argues that the judge placed undue emphasis on his past incarceration.  We disagree.  Although the judge found that the father was incarcerated for most of Spencer's short lifetime, and "compelled absence of a parent by reason of incarceration" may be taken into account, Adoption of Nicole, 40 Mass. App. Ct. 259, 261 (1996), this finding was not central to the judge's ultimate conclusion of unfitness.  See Care & Protection of Olga, 57 Mass. App. Ct. at 825.  The overwhelming thrust of the judge's findings attributed the father's unfitness to his history of domestic violence, substance abuse, and his lack of engagement in services.

The father also contends that the evidence of his substance abuse and his role as a perpetrator of domestic violence was stale.  The judge properly considered this evidence.  See Adoption of Elena, 446 Mass. 24, 33 (2006) ("A judge properly may consider a pattern of parental neglect or misconduct in determining future fitness and the likelihood of harm to the child"); Custody of Two Minors, 396 Mass. 610, 621 (1986) ("The

15

court is permitted to assess prognostic evidence derived from prior patterns of parental neglect or misconduct in determining future fitness and the likelihood of harm to the child"). The father had an extensive history of substance abuse and domestic violence. The father began drinking sporadically at age fifteen. At age twenty-four, he was prescribed oxycodone after a car accident and became addicted. By age twenty-six, he began using heroin and, ultimately, developed an addiction. He continued his use of heroin until approximately age thirty-nine. Likewise, the judge found that the father had an extensive history of domestic violence. The father was the defendant in nine G. L. c. 209A petitions brought by four different plaintiffs (three of the nine petitions were filed by the mother).

In addition, the father claims that the evidence did not demonstrate a nexus between his substance abuse, domestic violence, and his ability to parent. To the contrary, the record shows a strong link among these factors. On two documented occasions, the police were called because the father hit the mother in Spencer's presence. Both times, he blamed his conduct on drug use, once stating that he had not slept for three days because he was using Adderall, another time stating that he had not slept for five or six days because he was using cocaine. Clearly substance abuse played a substantial role in

the father's violence against the mother and Spencer's exposure to it.

The father misconstrues Custody of Vaughn, 422 Mass. 590, 599 (1996), to argue that the judge erred by failing to make "detailed and comprehensive findings" regarding the effect of domestic violence on Spencer. Judges are required to make such findings before granting custody to a parent who committed acts of domestic violence. "Where evidence of domestic violence is a factor contributing to a judge's decision to find a parent unfit or to terminate parental rights, however, the judge's findings need not be any more detailed or comprehensive than is required for any other factual findings supporting such determinations." Adoption of Yvonne, 99 Mass. App. Ct. 574, 578-579 (2021).

Finally, the father argues that he was present in Spencer's life, had a bond with him, and that the judge should at least have ordered posttermination visitation. We discern no error or abuse of discretion. The evidence supported the judge's finding that the father had no relationship with Spencer. While the father may have been "present" for the first two years of Spencer's life, for part of that time the parents lived apart and the father was under court order to stay away. His presence in Spencer's life terminated as the result of his own actions: he was arrested and sentenced to prison for assault and battery and strangulation of the mother. The father at first declined

to have Spencer visit him while he was incarcerated, then did not respond to the department social worker's monthly efforts to reach him and made no effort to contact Spencer for three years. See Adoption of Serge, 52 Mass. App. Ct. 1, 9 (2001) (department's "obligation to work with the mother was contingent upon her own obligation to fulfill various parental responsibilities, including . . . maintaining regular contact with [the department] and [child]").  The judge properly determined that posttermination visitation was not in Spencer's best interests.  See Adoption of Vito, 431 Mass. 550, 562 (2000) ("an order for postadoption contact is grounded in the over-all best interests of the child, based on emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent, not in the rights of the biological parent").

Decrees affirmed.

By the Court (Green, C.J.,
  Rubin & Massing, JJ.[5]),

*Joseph F. Stanton*

Clerk

Entered:  April 13, 2023.

---

[5] The panelists are listed in order of seniority.